ERRETT HALL, by ELI A. GREAVES, Next Friend, v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

Division One, April 13, 1909.

1. TRESPASSER: Volunteer on Train: Directed by Brakeman: Licensee. Where there was a conductor in charge of the freight train, and neither he nor any other train employee was authorized to employ or direct persons "beating" a ride on the train to do any work for the company, the act of a brakeman in directing such a person to get upon a moving car and set a brake was an act beyond the scope of the brakeman's authority, and such person was a trespasser. Nor was such person a licensee, since the brakeman's direction was without authority, and the company did not acquiesce.

2. ———: Duty of Defendant: Actual Knowledge of Peril. Where plaintiff, who in pursuance to a brakeman's direction got on a moving freight car to set a brake, was a trespasser, the only duty owing to him by the company was to use reasonable care not to injure him after he was actually known to be in a place of imminent danger or peril. In such case the rule that "if defendant, by the exercise of ordinary care, might have known of plaintiff's imminent peril in time to have averted the accident by the exercise of ordinary care and caution, and did not do so, then plaintiff is entitled to recover," does not apply. That rule applies only where defendant may reasonably expect persons to be present and in danger, such as at a public crossing, or on a railroad track habitually used by the public.

3. ———: ———: ———: **By Brakeman.** A car had been kicked back westward from the main track on to the south switch, but did not clear, and began to roll back on to the main track. Thereupon the brakeman, who had charge of the switching, told plaintiff, who is held to be a trespasser, to get up on the car and set the brake, and knowing that he had complied with the direction and that the car was moving eastward back towards the main track, and without waiting to see whether the plaintiff, who was an immature boy fifteen years old, would succeed in stopping the car before it rolled back on the main track, signaled the engineer to run other cars onto the north switch which branched from the main track about 93 feet further east, and the engineer did so at a rapid speed, and the westward one of the train's cars struck the corner of the one on which plaintiff was setting the brake, and injured plaintiff. *Held*, that, considering the plaintiff's age and inexperience, his position was a perilous one, and his peril was apparent to the brakeman, and the company is liable.

4. ———: ———: **Contributory Negligence.** Plaintiff, a boy fifteen years old, was directed by the brakeman to mount a car and set the brake, to keep it from rolling back from the switch onto the main track, and then signaled the train on that track to come on, and it did, and struck the corner of the car. The car was moving slowly at the time the boy mounted it, and he had jumped upon and ridden on moving cars for a long time. *Held*, first, that presumably the experienced brakeman would not have directed the boy to mount the car if that act amounted to negligence as a matter of law; *second*, when on the car the boy was attempting to set the brake and stop the car, and if his mind was diverted from the exact position of the car, that was not negligence as a matter of law, neither was his failure to jump off; *third*, he had a right to rely upon the brakeman not giving a signal to the engineer until the proper time; and, *fourth*, it was for the jury to say whether the immature boy was guilty of negligence in mounting the moving car, as in other acts, if there was any question of contributory negligence in the case—and there was not.

5. ———: ———: ———: **Trespasser: Humanitarian Doctrine.** There is no room in the case for the defense of contributory negligence where plaintiff is conceded to be a trespasser and seeks to recover under the humanitarian doctrine. That doctrine concedes that the injured party was negligent in being where he was, yet declares that defendant, knowing his peril in time by exercising ordinary care to save him from injury and failing to exercise such care, is liable.

Hall v. Railroad.

6. **CONFLICT IN INSTRUCTIONS: Invited by Appellant.** Where plaintiff's instruction is correct, and defendant's in conflict therewith and otherwise erroneous, a judgment for plaintiff will not be reversed because of the conflict. Where the negligence, if any, which caused the injury was the act of the brakeman, and plaintiff's instruction permitted the jury to consider the negligence of all of defendant's employees then engaged in the operation of the train and cars, and defendant's instructions permitted them to consider only the negligence of the engineer, the instructions were in conflict, but plaintiff's was right, and the judgment for plaintiff will not be reversed because of defendant's self-invited error.

7. **PLEADING: Negligence of Brakeman: Issue: Instruction.** A petition which charges that "defendant and defendant's said conductor, agents, servants and employees operating said train . . . negligently and unskillfully mismanaged the said engine, cars and train," etc., is broad enough to permit a recovery for injuries due to the negligence of the brakeman. And an instruction couched in much the same language submits the issue of the brakeman's negligence to the jury.

8. **NEGLIGENCE: Brakeman as Vice-Principal.** A brakeman whose duty it was to get the switch list from the station agent and proceed to do the switching, and got such list and upon whose signals the engineer acted, was a vice-principal of defendant, for he was the party at that time managing and "operating" the train.

Appeal from Johnson Circuit Court.—*Hon. W. L. Jarrott*, Judge.

AFFIRMED.

*Martin L. Clardy* and *R. T. Railey* for appellant.

(1) Plaintiff at time and place of accident was neither a passenger, employee, nor licensee, but a trespasser. The court below tried the case upon this theory, as will be seen upon an inspection of instruction 1 given at instance of plaintiff, and instruction 1 given at instance of defendant, and the case should be disposed of in this court accordingly. O'Donnell v. Railroad, 197 Mo. 110; Feeback v. Railroad, 167 Mo. 206; Stringer v. Railroad, 96 Mo. 206; Sherman v. Railroad, 72 Mo. 62; Snyder v. Railroad, 60 Mo. 413; 3 Elliott

on Railroads, sec. 1305.   (2)   The engineer testified
positively that he never saw plaintiff before the ac-
cident and he did not know he was on the car.   The
engineer likewise testified that he didn't know the pole
car was too close to track when he kicked the cars in on
north track.   The plaintiff testified that when the
brakeman saw the cars coming in on north track were
going  to strike the pole car, he gave a signal to stop.
It thus clearly appears that the brakeman believed up
to this time that the pole car was in the clear, and es-
pecially so as he was some distance away.   The en-
gineer and fireman both say that the cars were kicked
in on the north track and were detached from the en-
gine.   The engineer testified that, after he received
a signal from the brakeman to stop, he did stop and
then saw the dust fly from the pole car which was
struck.   When he stopped the cars which had been kick-
ed onto the north track were ten or fifteen feet from the
cars attached to engine.   There is nothing in the record
tending to show that the cars kicked onto north track—
and which were to be left there—were sent back with
more force than was necessary to carry them to the
proper place north of the depot, or that any damage
would have been sustained if the pole car had been
cleared.   The crew were in the defendant's private
switch yards, attempting in good faith to transact the
business of their principal.   Plaintiff was a trespasser
and had no legal right to be there, and especially upon
this car.   Both the engineer and brakeman swear posi-
tively that they did not know he was on the pole car.
Plaintiff was practically fifteen years of age at the time
of this accident.   He had had more than five years' ex-
perience as a train jumper, and seems to have been ex-
pert enough to climb on and off moving trains success-
fully.   According to his own testimony, he was watch-
ing the brakeman, the engineer, the cars and every-
thing connected with switching in said yard.   He was
standing on the east end of the pole car, in broad day-

light, with his face toward the locomotive and moving cars, and with the tracks and their relative positions directly in front of him. In other words, plaintiff, with years of experience in that business, with the physical surroundings in plain view and only a few feet off, never thought of the cars colliding until they were right on him, yet it is claimed the brakeman, who was one hundred and eight feet away, and the engineer, who was more than two hundred and fifty feet away, ought to have known that said car was too close and that plaintiff was there. Or, in other words, that the engineer and brakeman were guilty of either wanton, willful or reckless conduct, in respect to plaintiff, although they both swore they did not know he was there, nor that the car was too close. We therefore insist that plaintiff has signally failed to make out even the semblance of a case. O'Donnell v. Railroad, 197 Mo. 110; Carr v. Railroad, 195 Mo. 214; Chaney v. Railroad, 176 Mo. 598; Wencker v. Railroad, 169 Mo. 592; Feeback v. Railroad, 167 Mo. 206; Berry v. Railroad, 124 Mo. 223; Stringer v. Railroad, 96 Mo. 299; Sherman v. Railroad, 72 Mo. 62; Snyder v. Railroad, 60 Mo. 413; 3 Elliott on Railroads, sec. 1305; Sterger v. Van Sicklen, 132 N. Y. 499; Cusic v. Adams, 115 N. Y. 55; Morris v. Brown, 111 N. Y. 330; Larmore v. Iron Co., 101 N. Y. 391; Mc-Veety v. Railroad, 45 Minn. 268; Powers v. Railroad, 153 Mass. 188; Railroad v. Roach, 83 Va. 375; Railroad v. Brooks, 81 Ill. 245; McGauley v. Railroad, 93 Ala. 356; Flower v. Railroad, 69 Pa. St. 210; 2 Thompson on Neg.; secs. 3320, 3321; 2 Woods, Ry. Law, pp. 1044-5; Mathews v. Bensel, 51 N. J. L. 33; Ray's Negligence of Imposed Duties, pp. 22-3; Sweeney v. Railroad, 10 Allen (Mass.) 368; Heinlein v. Railroad, 33 A. & E. R. R. Cases, 500 Mass; Burbank v. Railroad, 45 A. & E. R. R. Cases, 593. The engineer was not guilty of either wanton, willful or reckless conduct, in respect to any duty which he owed plaintiff as a trespasser or otherwise. Neither was he guilty of negligence of any kind

or description, for he did not know plaintiff was on the pole car, nor did he know that the latter was too close to north track. He was attempting to perform his plain duty as expeditiously as possible under the circumstances, and in so doing was watching the brakeman, and relying on the signals which he gave. Hite v. Railroad, 130 Mo. 132; Farber v. Railroad, 139 Mo. 285; May v. Crawford, 150 Mo. 527; Koons v. Railroad, 178 Mo. 615; Higgins v. Railroad, 197 Mo. 317; Hendley v. Railroad, 106 Mo. App. 27; Ives v. Railroad, 107 N. W. 454; Felton v. Anderson, 66 S. W. 182; Railroad v. King, 51 S. W. 319. (3) The pole car may have run back toward the main track a few inches before stopping. When it stopped, the distance between the south rail of the north track and the rail on the south track was four feet. Plaintiff says that when the pole car was at the point aforesaid, the brakeman said to him, "Get up and set the brake," or words to that effect. The brakeman positively denies this, but on the contrary said that a short time before the accident he put plaintiff off the train and told him to keep away from said train; that plaintiff was upon said car without any authority or invitation and without the knowledge or consent of the brakeman. Plaintiff admits that he never set the brake on this car for he testified that he never set any brakes at any time but simply unloosed one. The brakeman then went onto north switch, opened same, and gave the engineer signals to back the train in order to kick the cars on north track which had been taken therefrom. It was evident that the brakeman thought this pole car was then in the clear of north track, as the south rail of north track was four feet from the south rail, or he would not have given the signal to back up the cars and cause a wreck, had he been aware of the situation. Plaintiff seems to have stayed on the car at the front end during all this time, and although everything was in plain view before him, he was not aware that the pole car was not in the clear

until the backing cars were right on him.  It seems that the brakeman—according to plaintiff's evidence—for the first time realized that the cars which were being kicked in on the north track could not pass the pole car, and he then gave the signal to stop.  This was after he looked back and saw the situation.  The engineer testified that upon receiving this signal to stop he applied the air and the head end of the train stopped; that the two sections of the train were ten or fifteen feet apart when he saw the dust fly off of the pole car.  The foregoing facts, outside of the engineer's testimony in regard to what was done in backing the cars on the north track, were given by plaintiff himself at the trial.  It cannot be said to be a mere matter of opinion, because he claims to have been standing on the east end of the pole car, within a few feet of the north track facing east, and so closely observant as to the situation that he even undertook to testify how the engineer acted, which direction he was looking, what the brakeman was doing, the kind of signals which were given, and everything else connected with the transaction.  On the foregoing facts it is respectfully insisted as plaintiff was there without authority and as a trespasser, that as he was performing no duty, either on invitation or otherwise, the brakeman had no reasonable grounds for supposing that he would remain upon said car unnecessarily, even if he had requested him to get up and set the brake when the car was first placed there.  The brakeman, however, testified that he was not aware of plaintiff's presence, and plaintiff himself having sworn that the brakeman attempted to stop the backing of the cars by proper signals after he saw the coal car was too close, how then could it be said that the brakeman violated any duty which he owed plaintiff under such circumstances?  None of the train crew violated any duty which it owed to this plaintiff as a trespasser at the time and place of accident.  Authorities cited under last proposition.

*O. L. Houts, Walter L. Lampkin* and *Charles E. Morrow* for respondent.

(1)   The conductor ordered the brakeman to take plaintiff and do the switching and the brakeman ordered plaintiff to get on the car and set the brake. Under all the authorities plaintiff was not a trespasser. He was a licensee.   The court erred in instructing the jury that he was a trespasser.   O'Donnell v. Railroad, 197 Mo. 122; Wencker v. Railroad, 169 Mo. 599; Houck v. Railroad, 116 Mo. App. 572.   Instruction 1 given for plaintiff did not declare him to be a trespasser.   Plaintiff did not adopt this theory at the trial.   The court, at the instance of defendant, gave instruction 1, which so declared.   To this action of the court plaintiff excepted.   Plaintiff being a licensee, it was the duty of the defendant's servants to look for him.   Chamberlain v. Railroad, 133 Mo. 587; Morgan v. Railroad, 159 Mo. 274; LeMay v. Railroad, 105 Mo. 361; Lynch v. Railroad, 111 Mo. 601; Williams v. Railroad, 96 Mo. 275; Houck v. Railroad, 116 Mo. App. 572.   Defendant, therefore, had an unfair advantage of plaintiff at the trial in this respect.   One to which it was clearly not entitled under the law.   (2)   The humanitarian doctrine applies to the facts of this case.   This is true whether the plaintiff is a licensee or trespasser. O'Donnell v. Railroad, 197 Mo. 122; Feeback v. Railroad, 167 Mo. 206; Weneker v. Railroad, 169 Mo. 599; Coleman v. Railroad, 117 Mo. App. 123; Morgan v. Railroad, 159 Mo. 274; Chamberlain v. Railroad, 133 Mo. 587; Klockenbrink v. Railroad, 172 Mo. 678; Reyburn v. Railroad, 187 Mo. 573; Hinzeman v. Railroad, 182 Mo. 611; Jett v. Railroad, 178 Mo. 664; Meeker v. Railroad, 178 Mo. 173; Baird v. Railroad, 146 Mo. 265; Holmes v. Railroad, 190 Mo. 98; Evarts v. Railroad, 22 L. R. A. 663.   The evidence showed conclusively that the brakeman and engineer actually saw plaintiff in peril in time by the exercise of ordinary care to have

avoided injuring him. The brakeman ordered plaintiff from a place of safety on to a moving car and then signaled the engineer to come back with his train. The brakeman was within thirty feet of plaintiff, directing the whole thing. He saw plaintiff and his peril and saw the train coming down on him. This was a question for the jury and having found it in plaintiff's favor, upon proper proof, ought to settle it. James v. Life Ass'n, 148 Mo. 16; Rine v. Railroad, 100 Mo. 235; Bender v. Railroad, 137 Mo. 241; Noeninger v. Vogt, 88 Mo. 593; Cambon v. Railroad, 165 Mo. 558. (3) Instruction 1 given for plaintiff properly declared the law. The brakeman and engineer were both guilty of gross and inexcusable negligence. The brakeman for ordering the plaintiff from a place of safety on to this moving car and then while the car was not in the clear, and the plaintiff in danger, giving the engineer the signal to come back with the train. The engineer in running into the car on which plaintiff was, with great force, while plaintiff was in plain view and while he was looking at plaintiff and was aware of his peril and danger and in not heeding the signal of the brakeman to stop, which he admits he saw. The cases of Heinzel v. Railroad, 182 Mo. 559, and Livingston v. Railroad, 170 Mo. 472, are not in point, for in those cases the evidence did not show that any other servant but the engineer was guilty of negligence. In this case, both were guilty of negligence and it was proper to submit it to the jury. The engineer testified that he was working under the direction of the brakeman and that it was the duty of the brakeman to see that the pole car was in the clear before he gave the signal to come back with the cars. In this particular this instruction is stereotyped and was taken from the books. Reyburn v. Railroad, 187 Mo. 572; Reardon v. Railroad, 114 Mo. 389; Morgan v. Railroad, 159 Mo.

272; Chamberlain v. Railroad, 133 Mo. 595; Malloy v. Railroad, 173 Mo. 75; Guenther v. Railroad, 108 Mo. 21. (4) The fact that at the defendant's request the court gave erroneous instructions, limiting the right to recover to the negligence of the engineer, was error against plaintiff, not defendant. Plaintiff's instructions being correct, the instructions given for defendant were erroneous. Defendant can not complain even if they are in conflict. That is no ground for reversing the judgment. Baker v. Railroad, 122 Mo. 533; Christian v. Ins. Co., 143 Mo. 460, 468; Roe v. Bank of Versailles, 167 Mo. 428; Canton v. McDaniels, 188 Mo. 225. If the instructions are inconsistent, it is because defendant obtained erroneous instructions, and "it is estopped from complaining of an error of its own creation and committed at its request." Sprague v. Sea, 152 Mo. 339; Reardon v. Railroad, 114 Mo. 384; Wilkens v. Railroad, 101 Mo. 105; Baker v. Railroad, 122 Mo. 598; Francis v. Railroad, 127 Mo. 675; Hahn v. Dawson, 134 Mo. 592.

GRAVES, J.—Plaintiff, a boy of fourteen years at date of the accident, sues by his next friend to recover from defendant damages in the sum of $25,000, for personal injuries alleged to have been received through the negligence of the defendant in the operation of one of its freight trains. By the petition it is charged that the plaintiff boarded defendant's local freight train No. 122 at Pleasant Hill, Missouri, to go go to the town of Kingsville, a few miles to the east; that he had theretofore been accustomed and was permitted by defendant's conductors, agents, servants and employees to board cars and to be carried thereon from one station to another, and assist them in handling freights and switching cars; then with reference to this particular occasion and the alleged negligence of the defendant, the petition says:

"That on the 22nd day of September, 1902, at the said town of Pleasant Hill, plaintiff boarded defendant's local freight train called Freight Train Number 122, with the knowledge and permission of defendant, defendant's conductor, servants, agents and employees operating the same, as plaintiff had been accustomed to do, as before stated, for the purpose of being carried to the said town of Kingsville, a station on defendant's said line of railway, and assisting in the operation of said train as aforesaid.

"That after boarding said train as aforesaid, plaintiff was carried thereon to the said town of Strasburg, a station on defendant's line of railway, between the said towns of Pleasant Hill and Kingsville, where said train was stopped and engaged in switching, which became necessary in its operation; that defendant and the said conductor ordered plaintiff to assist in and ordered one of the brakemen on said train to take plaintiff and do said switching, and that plaintiff, thereupon, in obedience to said order and under the direction of said brakeman, boarded one of defendant's freight cars on one of its said tracks and assisted in said switching and was in a place of peril.

"That while plaintiff was so engaged on said car, and was in said place of peril, defendant and defendant's said conductor, agents, servants and employees operating said train, knowing that plaintiff was on said car and in a place of peril and after they could have known it by the exercise of ordinary care, negligently and unskillfully mismanaged the said engine, cars and train and carelessly and negligently and with great and unusual and unnecessary force and violence, ran said engine and freight cars attached thereto, against the said car on which said plaintiff was, by reason of which plaintiff was thrown from said car to the ground, his right leg broken and his whole body wounded, bruised and permanently injured, so that he has been rendered unable to labor and has suffered

and will continue to suffer during his life great bodily pain and mental anguish, and was compelled to and did expend and obligate himself to pay the sum of five hundred dollars for medicine and medical attend-ance.''

The answer was, first a general denial, which was followed by a special plea of contributory negligence couched in this language:

''Said defendant for further defense states that if said Errett Hall was injured as charged in petition, it was by reason of his own wanton, willful and reckless conduct in unnecessarily, wantonly, recklessly and will-fully climbing upon defendant's train and cars while the same were in motion, without any authority so to do, and while he was a trespasser in so doing. That the injury, if any, to said Hall was occasioned solely by the negligence of his own acts aforesaid, contribu-ting directly to his own injury aforesaid, without any fault on the part of this defendant.''

Reply, a general denial. Verdict and judgment. for plaintiff in the sum of $6,000, from which, after the necessary but futile motions for new trial and in arrest of judgment had been passed upon, the defend-ant brings the case here by appeal.

The accident occurred September 22, 1902, at the town of Strasburg, as stated in the petition. At this town the defendant has three tracks, *i. e.*, the main track and a north and south switch track. The main track runs to the south of the depot, the south switch track is south of the main track, and the north switch track north of the main track and also north of the depot. In order words the depot stands between the north switch track and the main track. The east end of the north switch track is further east than that of the south switch track, and both some distance east of the depot. Actual measurements are given by one witness, as follows: The south switch leaves the main track ninety three feet west of the point where the north

switch track leaves it; at the widest point the south switch track is nine feet from the main track, but the north switch track is further because it spreads out to go around the depot; the place of the accident was fifteen feet west of the east point of the south switch; from the point of the accident to the first street crossing west was sixteen rails or four hundred and eighty feet; from the east point of the south switch to the window in the depot was nine hundred feet. These measurements are of but little value save and except as they go to affect the credibility of the witnesses.

There are three street crossings spoken of in the evidence, two to the east of the depot and one to the west. The first to the east runs just east of the depot.

From the evidence it appears that the plaintiff, rather an unruly orphan boy, being raised by his grand parents, had for some years been in the habit of jumping defendant's freight trains and in some instances riding from one station to another. He had been frequently notified by the station agent and by his grandfather of the danger of such conduct. He, himself, admits much of this conduct upon his part, and also some of the notices aforesaid.

The station agent claims to have not only warned his grandfather but the city marshal as well. He also claims to have driven plaintiff from the depot on several occasions, and on the morning of the day of the accident, says that he notified him to keep away from the depot.

On the day of the accident, shortly before noon, the plaintiff boarded one of defendant's freight trains at Kingsville, his home, and went west to Pleasant Hill. Upon reaching Pleasant Hill he says that he and some other boys were sitting on a flat car in the local freight going east, when the conductor came by and saw them. That the conductor undertook to fix a drawhead in one of the cars, and told the boys that if

they expected to ride they had better get down and help fix the drawhead, which they did, then returned to the flat car upon which plaintiff rode to Strasburg. The train reached Strasburg at about 2:20 p. m., and as there was an east-bound passenger train due there at 2:32 p. m., the local freight ran in on the south switch track and stopped with the caboose about opposite the depot. The plaintiff's car was several cars ahead of the caboose. When the train stopped, plaintiff got off on the side next to the depot, and there met another boy, William Epple, who lived at Kingsville, and who with his brother had on that morning ridden on the same freight train upon which plaintiff went to Pleasant Hill. The Epple boys got off and remained at Strasburg, the station between Kingsville and Pleasant Hill.

Upon the arrival of his train the conductor got off and gave some directions to the middle or swing brakeman about switching. One witness says that the conductor said to the brakeman: "I heard the conductor say: when he got down on the ground off the steps I was just behind him, he said to the brakeman— I think he said it to the brakeman—he said, take the boys down and do the switching."

Another said: "Why when I passed him he says to the brakeman, he says, you take the boys and go and do the switching."

Another put it this way: "Well I heard some man tell these boys to go down and set up the brakes."

William Epple puts it thus: "The conductor told the brakeman to go and take the boys and go and do the switching."

The plaintiff upon this point says:

"Q. And then what was done; what did the conductor do? A. Pulled down to the depot and the conductor came off of the caboose.

"Q. What did you and the boys do? A. I climbed down off the car.

Hall v. Railroad.

"Q. Then did you see the conductor after you got on the ground? A. Yes, sir.

"Q. What, if anything, did he say? A. He says, take the boys and go down and do the switching.

"Q. Who was he speaking to?

"*Mr. Railey*: I object to that; it is simply calling for the conclusion of the witness:

"*The Court*: State what he said.

"To which ruling plaintiff excepted and saved his exceptions at the time.

"Q. Who did he say that to? A. The brakeman.

"Q. How many brakemen was there? A. Two is all I seen.

"Q. Two where? A. Standing there.

"Q. When he said that what did the brakeman do? A. The brakeman started down the track.

"Q. How many started? A. Just one.

"Q. What, if anything, did he say? A. He says, Come on boys.

"Q. Which way did he go? A. Down east.

"Q. Along which track? A. Right down between the south track and main track.

"Q. How many tracks were there? A. Three.

"Q. Which track did you say this train pulled in on? A. South switch track.

"Q. How many boys went along with him down there? A. Just the two.

"Q. What two? A. Will Epple and I."

It appears that there were several people around the depot and among them some boys other than the plaintiff and Epple.

It also appears from other evidence than the plaintiff's own statement that there were two brakemen present at the time of this talk and further that at the time of the talk plaintiff was from fifteen to thirty-five feet away from the conductor. This from evidence introduced by plaintiff. The defendant's version we will state later.

The evidence then discloses that there were some cars on the north switch track (four or five in number) to the north of the depot. Of these cars the west one of the string was loaded with poles upon which to put signboards; that there were orders to put this car in the train to be taken to the next station. It was an ordinary coal car loaded with poles of the character aforesaid. To get this car in the train it became necessary to cut the train and leave a part standing upon the south switch track. This was done, and the engine with three or four cars was cut loose and pulled out upon the main track past the point of the north switch track, from which place the engine and cars were backed in on the north switch track and coupled to the string of cars above mentioned. After this coupling the cars were all pulled down off of the north switch track and an attempt made to kick this pole car in on the south switch track, where the caboose and remainder of the train was standing. The train seems to have been made up of from fifteen to twenty cars. The plaintiff describes his movements after the conductor's talk at the depot thus:

"A. Went down there and he uncoupled the train and I climbed on and rode out of the switch and back in the north switch and I seen they were going to hit the cars hard and I jumped off until they started up again.

"Q. And then did you crawl on again on that same car? A. Yes, sir.

"Q. What, if anything, did he say to you at that time? A. Never said anything; pretty soon he climbed on that car and started down that ladder and then he said, Get off kid and catch the next car.

"Q. Was that at the time you went down the north track east? A. Yes, sir.

"Q. That put you before or behind the brakeman? A. Behind.

"Q. You rode down, how far? A. I rode down to the south switch.

"Q. To where the south switch left the main track? A. Yes, sir.

"Q. And what did you do? A. I climbed off and went over to the south side.

"Q. Which side of the south switch did you stand on? A. Right by the side of it.

"Q. What did the brakeman do, and what did they do with the car? A. They kicked that car loaded with the poles back and it did not clear; never did get into the clear and started back slowly and the brakeman says, kid, get up there and catch that car and set the brake, and I got up to set the brake, and after I got up and got hold of the brake I seen him signal him to come back.

"Q. Who? A. The brakeman.

"Q. What kind of signal did he give? A. He give it this way (indicating).

"Q. How near was he to you when he gave that signal; about how near? A. About thirty feet.

"Q. Was there anything between him and you? A. No, sir.

"Q. Could he see you? A. Yes, sir.

"*Mr. Railey*: We object to that as a conclusion of the witness.

"*The Court*: Just state where he was. Objection sustained.

"To which ruling plaintiff excepted and saved his exceptions at the time.

"Q. He gave the signal to come back? A. Yes, sir.

"Q. Then what happened? A. They came back.

"Q. What came back? A. Cars and engine.

"Q. And were they all together? A. Yes, sir.

"Q. Then what happened? A. Hit the corner of the car I was on.

"Q. Then what happened? A. Knocked me off and two crossing poles.

"Q. When the brakeman gave this signal to come back who did he give it to?

"*Mr. Railey*: I object to that as calling for the conclusion of the witness.

"*The Court*: He stood where?

"Q. Where was the man on the engine when he gave the signals? A. Looking back toward us.

"Q. How was his head and face and body? A. Turned back west.

"Q. Where was he with reference to the window, leaning out or not? A. Leaning out.

"Q. When the signal was given? A. Yes, sir.

"Q. Window of the cab, I mean? A. Yes, sir.

"Q. Which way was he looking? A. Looking back at us.

"Q. Which way was his face turned? A. South.

"Q. Do you know anything about what kind of lick the cars struck? A. It was hard enough to tear the end out of the coal car.

"Q. Did it knock you senseless. A. Yes, sir.

"Q. When you came to where were you? A. Lying on the ground."

William Epple describes their movements in this manner:

"Q. What, if anything, was said or done at the platform at that time? A. The conductor told the brakeman to go and take the boys and go and do the switching.

"Q. Well, then, what did you do; did the brakeman say anything to you? A. Said, Come on boys and let's go and do the switching.

"Q. Who went with him? A. I and Errett.

"Q. Which way did you go? A. East.

"Q. How many brakeman were there? A. One.

"Q. Where did you go then; when you went east where did you go? A. How was that?

"Q. Where did you go? A. Went east to the end of the switch.

"Q.   What did you do?   A.   With him?.

"Q.   Do you remember what you did?   A. No, sir; I don't.

"Q.   What is the next thing you remember?   A. Riding down out of the switch.

"Q.   On the cars?   A.   Yes, sir.

"Q.   What kind of cars were they?   A.   Box cars.

"Q.   What switch was that on?   A.   North.

"Q.   Well, then where did the cars and engine go? A.   East.

"Q.   What was the purpose of going up on the north switch?   A.   To pull out this pole car.

"Q.   What was this coal car loaded with?   A. Sign posts.

"Q.   Then what happened when they pulled down off of the north track on the main track?   A. Kicked it back.

"Q.   Kicked what back?   A.   The coal car.

"Q.   Where did they kick it to?   A.   On the south.

"Q.   How far back on the switch did it go?   A. It didn't quite clear.

"Q.   What was that?   A.   It didn't quite clear the track.

"Q.   Then what happened?   A.   Then he knocked the corner off of the coal car.

"Q.   Did you get up on that car?   A.   Yes, sir.

"Q.   What caused you to get up there?   A.   The car started back.

"Q.   Did Errett get up on that car?   A.   Yes, sir.

"Q.   How did he happen to get upon that car?

"*Mr. Railey*:  I object to that; it is merely calling for a conclusion.

"*The Court*:  He can state what he saw; objection sustained.

"To which ruling plaintiff excepted and saved his exceptions at the time.

"Q.   What did you see him do?   A.   The brakeman told him to go up and set the brake down.

"Q. Well was the car moving when he got on it? A. Yes, sir.

"Q. Was it going fast or slow? A. Slow.

"Q. Where was the engine and cars just before it was struck? A. East of the switch.

"Q. Could you see anybody in the engine? A. Yes, sir.

"Q. Which side where they on? A. Right side.

"Q. What would that be, north or south? A. South side.

"Q. Describe the position of the man in the engine? A. He had his head and waist out looking back towards us.

"Q. What direction would that be? A. West.

"Q. Could you see his face? A. Yes, sir.

"Q. Which way was it turned? A. Toward us.

"Q. Where was the brakeman? A. He was down there by us.

" Q. How far was he from you? A. About twenty or twenty-five feet.

"Q. What direction from you? A. East.

"Q. I will ask you to tell what happened when the car was struck that you and Errett were on? A. It threw us both off.

"Q. Did it throw anything else off the car? A. A pole.

"Q. What was Errett doing when the car struck? A. Putting on the brake.

"Q. Sir? A. Putting on the brake.

"Q. Putting on the brake? A. Yes, sir.

"Q. What end was he on? A. East.

"Q. Where were you? A. South.

"Q. Did you notice what the train did after they struck this car? the engine and other cars east of it? A. What they did with it?

"Q. Yes, sir? A. I don't know.

"Q. Well, state to the jury how they came back, fast or slow? A. Fast.

Hall v. Railroad.

"Q. How was the jar; describe it to the jury? A. It was awful; came back about thirty miles an hour.

"*Mr. Railey*: We move to strike that out; he has not shown himself qualified to judge the rate of speed.

"*The Court*: Yes, sir; he would have to show himself . qualified.

"To which ruling plaintiff excepted and saved his exceptions at the time.

"Q. You may state to the jury whether or not the engine and the cars all came back together? A. Yes, sir.

"Q. About how many cars were there with the engine at that time? A. Five.

"Q. What kind of cars were they? A. Box cars.

"Q. Did you notice after that, what became of the engine and box cars? A. No, sir."

In this connection it will be well to mention that this witness had given two written statements to the defendant's claim agent, in which he says that he did not hear the conductors's talk at the depot, and did not hear the brakeman tell Hall to set the brakes on the pole car.

Another witness, Haynes, says:

"Q. Then what did they do? A. Well, then they run the cars down to get the post car off of the side-track and run it up on the main track and when they run it up on the main track it looked like they wanted to make a flying switch but they didn't get it quite far enough up and then the car commenced moving down east, the car the boy was on, and the brakeman was on the south side of the main track that they was pulling on and he says to the kid, he says, Kid, he says, set that brake and then they gave it another punch to shove it back and they hit so hard they knocked a piece off the car and the boy went off and the posts went with him."

There is considerable evidence for plaintiff tending to show that the engine and all the cars ahead of the pole car were attached when they struck the pole car, and that they struck it with great force. Both cars were considerably damaged by the collision.

For the defendant, the evidence tended to show that the plaintiff and the other boys alighted from the car east of the second crossing east of the depot; that they then were next seen riding on a car on the north switch. The conductor says that he did not see nor converse with any boys at Pleasant Hill; that they repaired no car there; that if a car had been out of repair at Pleasant Hill there was a car repairer there by name of Lane, and the car would have been turned in on the repair track for repairs. In this he is corroborated by all the train crew.

The conductor says that he had no knowledge of plaintiff being on his train, and that he gave him no orders about switching at Strasburg. He says that he did tell the swing brakeman, who had gotten the switching list and order from the agent, to take the boys and do the switching, but says that in the use of the word "boys" he used it in railroad parlance, which meant the brakemen and crew; that he used it in that sense and had no reference to plaintiff or any other outsider; that he had no knowledge of the fact that plaintiff was in any way assisting in the switching of cars; that at the time of the accident he and the rear brakeman were unloading the local freight.

It also appears that there was the full complement of men with this train, i. e., conductor, three brakemen, a fireman and engineer.

It is shown that neither the conductor nor any member of the train crew has any authority to employ outsiders to do any of the train work for the company.

Both the engineer and fireman say that they did not know the plaintiff was on the train. They say that the pole car was kicked in on the south track, and that

they cut loose from the train the other cars which stood ahead of the pole car whilst on the north track and aimed to kick them in on the north track. The engineer said that they kept the cars supplied with air-brakes next to the engine to assist in stopping the train, but did not remember just how many they had with them when they backed on the north switch track for the pole car. The engineer describes the collision thus:

"Q. Then went north? A. Yes, sir; on the house track switch.

"Q. Then what did you do? A. Backed in on the north side and there was several cars in there, I don't know how many, and we coupled them and brought them down on the main line.

"Q. What car or cars were you after? A. A coal car loaded with crossing signs that was back of some cars that were on the sidetrack.

"Q. Do you know how many there were in front of this pole car? A. No, sir; not exactly; probably six or seven.

"Q. What did you do with them? A. We come out there and kicked the coal car back on the south siding or started it back on the south switch to our train, the brakeman cut it off and signaled me to go ahead; I went ahead probably three or four car lengths, anyhow over east of the east end of the north switch; then he gave me the signal to back up, to kick cars, to kick them back on the north track; the cars that were in there ahead of this coal car, that is, between us and the coal car, and I gave them a little kick and he gave me the signal to stop and I applied the air and the head end of the train stopped; the cars that were going back on the north side run back. I guess they were ten or fifteen feet part when I saw the dust fly off of the coal car.

"Q. That far from the locomotive? A. The two parts of the train were probably ten or fifteen feet apart when I seen the dust fly off the coal car, and

about that time I saw a boy fall off the car, and I says to the fireman, they have knocked a boy off the car, and we stopped. In the first place I saw that he didn't get up; seen he must be hurt, he laid there after he fell off, then I gets off the engine and walks back and seen the boy's leg was broken; I was the first man to him.''

The fireman says he did not see the boy at all. The engineer further testified that in switching the engineer acted under signals given by the brakemen; that it was the duty of the brakemen when they kicked in a car to see that it was in the clear, before giving a signal to back up; that in this instance he got the signal to back up and did so, but got a signal to stop and did at once apply the air and brakes and stopped.

Other evidence showed that it was the duty of the swing brakeman, who was a man by the name of Boggs in this instance, to get from the station agent the switching list, and then look after the switching of the cars.

The conductor, fireman, engineer and rear brakeman testified in person at the trial. As to the other two, statements of their evidence were read by counsel. Their statements are:

"It is agreed by and between counsel for both plaintiff and defendant that the following statement may be read to the jury as the evidence of H. M. Boggs, which said statement was read to the jury and was in words and figures as follows, to-wit:

"That he put the plaintiff, Errett Hall, off the train a short time before the accident complained of and told him to keep away from said train; that said plaintiff, without the knowledge and consent and against the protest of said Boggs, got upon defendant's box car at the time of his injury, and was there without any authority or invitation or direction from any of the train crew; that neither the conductor nor any of the other train crew either directly or indi-

rectly authorized, directed or requested said Hall to get upon said defendant's train of cars or to perform any other duty or service connected with said train.

"It is further agreed by and between counsel for both plaintiff and defendant that the following statement may be read to the jury as the evidence of Louise Buske; which said statement was read to the jury, and was in words and figures as follows, to-wit:

"That he was at the east end of the switch at the time of the accident; that neither he nor any of the other brakemen or train crew authorized or directed said plaintiff to get upon the car where he was injured or to perform any other service connected with said train."

One matter of dispute was whether the car which struck the pole was attached to the engine or the string of cars next to the engine, or whether it and others had been cut loose from the train, and was separated therefrom at the time of the collision. For the defendant this testimony tends to show that the pole car was first cut loose from the train and then the others belonging on the north switch track. For the plaintiff, contra.

A number of photographs of the track and depot situation were in evidence.

The court refused a peremptory instruction for defendant, both at the close of the plaintiff's case, and at the close of the whole case.

For the plaintiff, the court instructed thus:

"1. The court instructs the jury that if you should find and believe from the evidence that Errett Hall was on one of the defendant's freight cars on its tracks in Strasburg and engaged in setting the brake on said car and while so engaged he became and was in a place of danger and that defendant's agents, servants and employees in charge of and operating and

managing an engine and cars attached thereto, saw the said Errett Hall and his said peril and danger and became aware thereof in time, by the exercise of ordinary care, to have avoided injuring him, and that the defendant's said agents, servants and employees in charge of said engine and cars attached thereto failed to exercise such ordinary care, and negligently ran said engine and cars against the car upon which the said Errett Hall was, with great and unusual force and violence, and by reason thereof the said Errett Hall was thrown from said car to the ground and injured, then you should find for the plaintiff, although you may believe from the evidence that plaintiff, Errett Hall, was guilty of negligence in going upon said car and attempting to set said brake and was a trespasser, unless the jury should further find from the evidence that after he became aware of his own peril, or by the exercise of ordinary care might have become aware of his peril, he could have, by the exercise of ordinary care, avoided the injury.

"3.    By ordinary care is meant such care as an ordinarily careful and prudent person would exercise under the same or similar circumstances.

"Negligence is the failure  to  exercise  ordinary care.

"If you find that Errett Hall was a boy of immature age, and had not the capacity of an adult, and that he exercised such care as ought reasonably to have been expected of one of his age and capacity, then he is not guilty of contributory negligence."

"4.    If the jury find for the plaintiff, in estimating his damages, they will take into consideration not only his age, the physical injury inflicted, and the bodily pain and mental anguish endured, but also any and all damages, if any, which it appears from the evidence will reasonably result to him from his injury in the future, not to exceed in all the sum of twenty-five thousand dollars."

For the defendant the court gave the following in-
structions:

"1.  The court instructs the jury, that under
pleadings and evidence in this cause, the plaintiff, Er-
rett Hall, at the time and place of accident, was not a
passenger upon defendant's train or cars and was not
an employee of said defendant; on the contrary, at the
time and place of accident aforesaid, said plaintiff, Er-
rett Hall, had no legal right to be upon said car and
was a trespasser thereon, and the jury in disposing of
the case, should try it accordingly.

"2.  Even if the jury believe from evidence, that
the conductor told this brakeman to take the boys and
do the switching; and the brakeman to whom the re-
marks were addressed went with plaintiff and directed
him to get upon the car from which he was thrown, yet
this conferred no authority upon plaintiff to get upon
said car, and in getting upon the same to set the brake,
if he did attempt to do so, he was a trespasser without
any authority to be there, and it is your duty to dis-
pose of the case accordingly.

"3.  If the jury believe from the evidence that de-
fendant's engineer kicked the cars back on the north
switch, which struck the one on which plaintiff climbed
and undertook to set the brake; and that plaintiff
thereafter got upon said car, from which he was
thrown, then was thrown, then he is not entitled to re-
cover in this cause, regardless of all other facts.

"4.  Even if the jury should find and believe from
the evidence that plaintiff, Errett Hall, was upon de-
fendant's pole car, attempting to set a brake, with the
knowledge and consent, or on the invitation of one of
defendant's servants, yet he assumed the risk in being
thus located and is not entitled to recover, unless he got
upon said car while the locomotive was still attached to
to the cars which came in on the north track, and that
the engineer in charge thereof actually saw him upon
said car and had good reason to believe at the time that

the cars upon said north track could not pass said pole car, without striking same.

"5. Before the plaintiff can recover herein, the jury must find and believe from the greater weight of all the evidence, not only that the engineer in charge of the train actually saw plaintiff on the car of poles, when he backed or kicked the cars onto the north track which struck the one upon which plaintiff was stationed, but that said engineer at the time knew said car upon which plaintiff was stationed was so close to the north track that it was bound to be struck by the cars so backed or kicked onto said north track. Unless the jury so find, your verdict must be for defendant, regardless of all other facts in the case.

"6. Unless the jury believe from the greater weight of the evidence that defendant's engineer, when he kicked or pushed the cars onto the north track, actually knew that the pole car was so close to said north track as that the cars so kicked or pushed onto said north track would strike the same, then the plaintiff is not entitled to recover herein, even if said engineer did actually see the plaintiff, Errett Hall, stationed on said pole car.

"7. Before the jury can find for plaintiff, you must find and believe from the greater weight of the evidence:

"1st. That defendant's locomotive was attached to the cars sent in on the north switch, immediately before the collision.

"2nd. That the pole car from which plaintiff fell, was known by the engineer, at the time he was pushing back the cars onto the north track, while still attached, to be so close to said cars on the north track that they were bound to strike same.

"3d. That the engineer in charge of said train, while his locomotive was still attached to the said north cars, actually knew plaintiff Errett Hall was upon said pole car, and that the latter was too close to the north

track at said time for said cars on the north track to pass, without colliding with said pole car.

"Unless the jury find from the evidence all three of the propositions aforesaid, in favor of said plaintiff, your verdict must be for defendant regardless of all other facts in case.

"8.   The court instructs the jury, that defendant has read in evidence a statement as to what the testimony of brakemen Boggs and Buske would be if they were present in person and had testified in this cause. In arriving at your verdict, you will consider the statement of said witnesses as though they had been personally present and had testified in court to the facts set out in said statement.

"9.   While the plaintiff, Errett Hall, is a competent witness to testify in his own behalf, yet the jury, in determining what weight, if any, they will give to his testimony, have a right to consider his interest in the result of this litigation, and what he has testified to against his interest is to be taken as true, and what he has testified to in his own favor is to be given only such weight as the jury, under all circumstances in the case, deem it entitled to.

"10.   The jury are the sole judges of the credibility of the witnesses and of the weight to be given their testimony.  In arriving at your verdict it is your duty to take into consideration all the facts and circumstances detailed in evidence; the interest, if any, which the witnesses testifying have in the result of litigation; their means of information as well as their conduct upon the stand; and if you believe from the evidence that any witness has knowingly or wilfully sworn falsely to any material fact in the case, then you are at liberty to disregard the whole or any part of the testimony of such witness.

"11.   The court instructs the jury, that in arriving at a verdict in this case, they must exclude from their consideration the evidence of the witness, Alcorn,

drawn out in cross examination, in which he swore it was the duty of defendant's brakeman to see that the car mentioned in evidence as the 'pole car' or 'coal car' was in the clear before giving a signal to the engineer or person in charge of defendant's engine.''

And for the defendant, the court refused to give the following:

''A.   If the jury believe from the evidence that an ordinarily prudent person possessing the intelligence and experience in regard to the operation of trains which plaintiff possessed at the time of accident, could have learned before getting upon the pole car that it was too close to the north track for cars kicked in thereon to pass by said pole car without colliding with same, then he is not entitled to recover herein, regardless of all other facts.

''B.   If the jury believe from the evidence in this case that at the time plaintiff attempted to get upon the pole car, it was so close to the north track as to prevent cars being moved west on said north track, without colliding with the pole car, and that said fact was open and apparent to one of plaintiff's age and intelligence, then said act upon his part constituted such negligence as to preclude him from recovering in this case, and under such circumstances your finding must be for defendant, irrespective of any other facts in the case.''

We have made this statement perhaps fuller than necessary, but defendant insists upon its demurrer, and thus the necessity for a full statement.

I.   Counsel with much zeal discuss the question of liability in this case.   For defendant it is urged that no case has been made for the jury.   With equal force counsel for plaintiff urges *contra*.   To read the brief of counsel for plaintiff one would think that it would be useless expenditure of time to investigate the question of liability, so apparent is there liability to their mind.

On the other hand reading from counsel's brief and argument for the defendant you would be impressed with the idea that even a cursory examination of the record discloses no case made for the plaintiff, and a further examination would be at a great waste of labor. But wiping away the zealous presentations by the respective able counsel and going to the cold record before us, we are brought to a realization that the question is an exceedingly close one, not to be brushed aside either one way or the other without outlining the facts in detail. We have given a full statement, that the relative acts of the parties might fully appear, but much of it may be cast aside before we reach the crucial point. Thus it is a disputed question whether defendant's conductor knew of plaintiff's being on the train from Pleasant Hill to Strasburg, but taking plaintiff's version of it (as we must in determining the question whether a demurrer to the testimony should have been sustained), yet we think all this has but little bearing on the ultimate issue in the case. At most this testimony simply shows that plaintiff was permitted to ride on the train in consideration of his having assisted in repairing a car at Pleasant Hill. As to how far he was to ride, or where on the train he was to ride, does not appear, except by inference, and this inference is that he was to ride on the flat car where plaintiff said the conductor found himself and some other boys. Singularly to say these other boys drop out of sight entirely in this case, after the incident in Pleasant Hill was over. The relation of plaintiff to defendant on the trip from Pleasant Hill to Strasburg is immaterial, because no injury resulted to plaintiff by reason of that relationship or by reason of being at the place the conductor permitted him to ride. We must go to the occurrences at Strasburg to determine the status which plaintiff bore toward the defendant. There plaintiff left the position occupied by

him from Pleasant Hill to Strasburg, and a new align-
ment is made.  Plaintiff there gets off the train some
three or four cars ahead of the caboose and goes north
toward the main track and west towards the depot,
where he met young Epple, who with himself and a
brother of Epple's had beat their way from Kingsville
to Strasburg that morning.  What became of his fel-
low passengers, three Holden boys, from Pleasant Hill
down, does not appear.  Plaintiff then says that when
he got within fifteen or twenty feet of the conductor,
who had gotten off of the caboose, he heard the con-
ductor say to the middle brakeman, "Take the boys
and go and do the switching."  This remark he says
was addressed to the middle brakeman; that at the
time there were two brakemen and some four or five
other boys near the conductor.  Epple says there were
eight or ten boys.  This number did not include plain-
tiff and Epple.  This testimony standing alone is of but
little value.  It does not show that either plaintiff or
Epple were included in the direction given by the con-
ductor.  As we gather it both plaintiff and Epple were
further from the conductor than the brakeman and the
other four or five boys.  If we are to apply these re-
marks at all to parties outside of railroad employees,
they could with more propriety be applied to the other
boys than to plaintiff, so that to this point we have but
little tending to fix the status of plaintiff towards the
defendant.  The brakman was to the west of these boys
at the time of this remark, as we gather it from the
evidence.

From this point on, the plaintiff either makes or
does not make his case.  Plaintiff's testimony is that
one of the two brakemen started east, and said, "Come
on, boys."  We are left to infer that these remarks
were addressed to plaintiff and Epple so far as plain-
tiff's individual testimony is concerned, but Epple fills
up the gap by saying that the remarks were addressed
to them.  At any rate these two boys followed, but

seem to have done little toward switching until the accident. Plaintiff claims to have set a brake before the train was first cut on the south track and to have unloosened a brake on one of the cars on the north track. The plaintiff's evidence made it appear that these boys were there, whatever they were doing.

Going now to the last link in the chain we find plaintiff and Epple on the south side of the south switch track in a place of safety. The pole car is "kicked back" on the south switch track; it begins to move slowly toward the east. The car was to the west of the point of the south switch track, and this was ninety-three feet west of the point of the north switch track. Thus far, to get positions. The middle brakeman, after the pole car had been "kicked" in on the south switch, and the engine and other cars pulled up east of the north switch track, opened this north switch so as to allow the other cars to be pushed or "kicked back" on that track. He then went across to the south side of the main track to give signals. Epple says he was thirty feet to the east of him, but it is not explained how he was only thirty feet to the east if he came directly across from the north switch, which was ninety-three feet east of the south switch. Plaintiff himself says he walked right across from the north switch to the south side of the main track, but he also said in chief he was thirty feet east of him when he gave the signal. On cross examination when pressed he said he didn't know how far east of him the brakeman was at the time. The car started to move slowly eastward, and he and other witnesses say the brakeman told him to get up and set the brake, which he attempted to do. We take it that under all the facts of this case his status as to defendant is fixed by this order. This evidence shows that the brakeman knew the place occupied by plaintiff, but does it show that the brakeman knew that the car had reached a point where a collision would occur at the time he gave the signal to the en-

gineer to back up? At this juncture it becomes necessary to determine the relation which plaintiff bore to the company. The case was tried on the theory that he was a trespasser. Instructions for both sides so read and the humanitarian doctrine alone is invoked. Both sides having adopted that theory below, we might proceed here upon the same theory with propriety and without determining the exact status of plaintiff, and would do so but for the fact that plaintiff's counsel now urge in the brief that he was not a trespasser and therefore defendant was really favored by the theory upon which the case was tried.

We are of opinion that the plaintiff was a trespasser and the defendant's liability, if any there be, must be guaged by the care required of it as to trespassers. The evidence shows that there was a *conductor in charge of this train,* and that neither the conductor nor any other train employee was authorized to employ or direct persons to perform work for the defendant. There is nothing in the record to show any such powers or duties. *The act of the brakeman in directing plaintiff to get upon the moving car to set a brake was an act beyond the scope of his authority.* [Snyder v. Railroad, 60 Mo. 413; Sherman v. Railroad, 72 Mo. 62; Milton v. Railroad, 193 Mo. l. c. 57.]

If the direction was without authority it was not such as would make the plaintiff a licensee of the defendant. A license could only be granted by some authorized act of the defendant, or by acquiescence of defendant for a length of time.

The status of plaintiff being fixed as that of a *trespasser* the only duty owing to him by the defendant was to use reasonable care not to injure him after he was discovered and known to be in a place of imminent danger or peril. In some of the cases applying the humanitarian rule it is stated that "if defendant knew, *or by the exercise of ordinary care might have known,* of the imminent peril of deceased in time to

have averted the accident by the use or exercise of ordinary care and caution, upon its part, and did not do so, then the plaintiff is entitled to recover.'' But this broad rule does not apply to this case. In this case it is incumbent upon the plaintiff to show that defendant or its agents actually knew that plaintiff was in a dangerous place. The rule that a defendant might have known of the dangerous position of a party by the exercise of ordinary care only applies to such cases where the defendant has a reason and right to expect persons to be in danger, as at a public crossing, or on a portion of track habitually used by the public, or such other similar conditions. In all other cases the plaintiff fails unless actual knowledge is shown. As shown by his instructions the plaintiff in this case understood the law as we do, for the first instruction requires *actual* knowledge of the dangerous position. Does the evidence so show? We shall take the engineer and brakeman separately.

The positive statement of the engineer is that he never saw the boy until after he had fallen to the ground. For the plaintiff the evidence shows that the engineer was on the south side of the cab leaning out and looking west toward where the pole car stood, taking signals from this brakeman who stood on the ground to the south of the main track. Two things must be shown to convict the engineer, (1) that he saw plaintiff upon this car, and (2) that he knew the car was in position to be struck by the cars in his train when he backed them to the west and with this knowledge proceeded to bring about the collision, and not only destroy his master's property, but injure the plaintiff. No sane man believes he did this. The plaintiff's whole case as to the engineer rests upon the theory that he was facing west toward where this car was, taking signals from the brakeman. He had no reason to expect a trespasser upon any car. He had no reason to look further than to the signals of the brake-

man. Under the evidence it was his duty to watch the brakeman for signals, and in this very case the necessity of the engineer watching the brakeman who gives the signals, rather than the cars or tracks, is fully demonstrated, for it appears that the brakeman finally discovered danger and had to give another signal to stop. Defendant explains the inability to stop by showing that the cars for the north track had been cut loose from the engine, and whilst the engineer stopped the other cars and his engine attached thereto he could not stop these cars. As to whether this was a fact was disputed by plaintiff's evidence. It is also shown that there were a number of box cars between his engine and the pole car, and it is not shown that in his position he could even see the track upon which he was running. He might have had his face in the direction of plaintiff and no doubt did, because he was taking signals from the brakeman which required him to look in the direction of plaintiff, but this does not show that he saw the plaintiff, or saw and knew that the pole car was not in the clear. *The evidence is not sufficient to convict the engineer, nor the defendant for the alleged negligence of the engineer.*

Now as to the brakeman. His position is different from that of the engineer. Under the evidence he was the man who directed and controlled the acts of the engineer. Upon his signals the engineer moved. He was the man in charge of this work under the record evidence. Under plaintiff's evidence the car had not cleared the main track in the effort to "kick" it in on the south track. Under the evidence it was moving eastward. As to how far it would have to move to occasion a collision with cars going in upon the north switch track is not apparent, but that it did move to such a point is apparent.

The evidence for plaintiff shows that the brakeman did know that plaintiff was on that car and did know that it was moving eastward, and that it was

either in, or might soon reach a place where a collision would be inevitable. Without evidence the court knows that it was the duty of this brakeman, having charge of the switching, to see that this car was in the clear before giving orders for other cars to be "kicked" or pushed back in that direction. This was a duty to his master. But extended discussion of this question is unnecessary. As above stated the brakeman knew the boy was on the car and knew the car was moving in the direction from which the other cars were to come upon his signal. The distance was evidently short. These facts alone render the position of a boy of plaintiff's age a perilous one, conditioned upon the movement of the car and the boy's ability to mount it and apply the brakes. Under the plaintiff's evidence all this was apparent to the brakeman. The boy was in a perilous position from the time he attempted to mount the car to the moment of the accident and this was known to the brakeman. As to the brakeman the evidence is sufficient to take the case to the jury. He should have seen that the car had been stopped in a safe position before giving his signal.

II. It is next contended that the plaintiff was guilty of contributory negligence in going upon and remaining upon the pole car. It is said that he had been jumping cars for some five years and was perfectly familiar with switching movements. That he was fifteen years old, lacking three months, and should have seen the peril he was in and protected himself by jumping off of the car when he could have seen that it was in a position to be struck. It is true that the evidence showed the boy to have jumped and ridden upon moving cars for a long time prior to the accident. It is also true that the evidence discloses his age to be nearer fifteen than fourteen years. All this we grant, but can it be said that there was such contributory negligence as to take the case from the jury in a case wherein contributory

negligence would be an effective defense? When he boarded the car it was under the direction of an experienced man, and presumably such experienced man would not have directed the act if it amounted to negligence as a matter of law. But to the facts. The car was moving slowly and the boy got on it. We can't say that was so negligent as to take the question from the jury even if contributory negligence were a matter of defense in the case. When on he was attempting to set the brakes and stop the car and if in such act his mind was diverted from the exact position of the car, we can hardly denominate that negligence as a matter of law. Again in going there he had a right to rely upon the brakeman not giving a signal until the proper time. The evidence also shows that the engine and cars were backed up at a very rapid rate of speed. Under all these facts it was a question for the jury to say whether or not plaintiff was guilty of such contributory negligence as would bar a recovery, if in fact a question of contributory negligence is in this case at all, which question we reach later.

We conclude, therefore, that the demurrer to the testimony was properly overruled.

III. Connected with the foregoing and closely allied thereto is another contention of defendant to the effect that the court refused to give instructions A and B as by it requested. These two instructions submit the question of the alleged contributory negligence of the plaintiff in getting upon the car. To our mind the theory upon which this case was tried upon both sides fully answers this contention. That theory was that plaintiff was a trespasser and had no right to be where he was, and that if he recovered at all it was upon the humanitarian rule. The petition is drawn upon the humanitarian doctrine. The plaintiff's case is put to the jury upon that idea and none other. The humanitarian doctrine presupposes negligence or contributory negli-

gence upon the part of the party invoking the rule. That doctrine in its essence is that conceding that I am guilty of negligence in being where I am, yet if you know of my peril in time to save my life or limb, by the exercise of ordinary care on your part, then it is your duty to exercise such care, and a failure to so do, renders you liable. In this case there was no error in refusing these instructions.

IV. It is next urged that plaintiff's instruction number 1, supra, is in a measure conflicting with numbers 4 to 7, inclusive, given for defendant. This is true. Plaintiff's instruction permits the jury to consider the negligence of all the defendants's employees then engaged in the operation of the engine and cars, whilst the four instructions mentioned limit it to the negligence of the engineer alone. *The plaintiff's instructions permitted a recovery upon the negligence of the employees or either of them.* Plaintiff's instruction we think was well enough, following as it did the petition. Defendant's instructions numbers 4 to 7 were erroneous in undertaking to limit the right of recovery to the negligence of the engineer alone. In such case the error was committed in defendant's favor in this matter. In Christian v. Insurance Co., 143 Mo. l. c. 468, SHERWOOD, J., said: "A long while ago it was decided in this State that a party cannot complain of errors in an instruction given at his own instance. [Flowers v. Helm, 29 Mo. 324.] This ruling was thought indisputably good law for many years. Later on, however, in Bluedorn v. Railroad, 108 Mo. 439, a brand new doctrine was proclaimed, to-wit: That if the instructions of a plaintiff in a damage suit were all right and regular, but one asked by and given to defendant was erroneous and in conflict with the correct instructions of plaintiff, and the latter recovered, this conflict, on the appeal of defendant, would necessitate the reversal of the judgment. . . . . In other words, that self-

invited error was ground for reversal. But this heresy was not long-lived; it received its *coup de grace* in Baker v. Railroad, 122 Mo. 533. So that having held plaintiff's instruction 7 is free from error, it must needs follow that if defendant's instruction 2 is in conflict therewith, it must be erroneous, and if so, defendant takes nothing by reason of such conflict."

It should not be overlooked that this swing brakeman was the man controlling the movements of the engine and the cars in the yard. Under the plaintiff's instruction the jury could have well found for the plaintiff on the negligence of this brakeman.

Other points made have been examined, but these are the only ones we deem necessary to mention in further detail.

The judgment is affirmed.

All concur.

## ON MOTION FOR REHEARING.

GRAVES, J.—It is earnestly insisted in the motion for rehearing that the negligence of the brakeman was never submitted to the jury and that therefore the issue found by this court as vital to defendant's case is an entirely new theory injected here for the first time. And it is further insisted that the petition does not count upon the negligence of the brakeman. If either of these contentions was well founded, there would be error in the opinion, but they are not, as we read the petition and the instructions.

In the first place the petition, after stating that plaintiff was placed in a place of danger by the direction of the brakeman, then proceeds: "That while plaintiff was so engaged on said car, and was in said place of peril, *defendant and defendant's said conductor, agents, servants and employees operating said train,* knowing that plaintiff was on said car and in a place of peril and after they could have known it by the

Hall v. Railroad.

exercise of ordinary care, *negligently and unskillfully mismanaged the said engine, cars and train and carelessly and negligently and with great and unusual and unnecessary force and violence ran said engine and freight cars attached thereto, against the said car on which said plaintiff was, by reason of which,"* etc.

This petition is certainly broad enough to include the brakeman. It includes in its allegations not only all the agents and employees of defendant, but the defendant itself, the language being, "defendant and defendant's said conductor, agents, servants and employees operating said train." It does not stop here, but it avers that "they" (referring to the clause above, which included defendant and all of its employees) "negligently and unskillfully mismanaged the said engine, cars and train and carelessly and negligently . . . . ran said engine and freight cars attached thereto against the said car on which plaintiff was," etc.

So that it is apparent that a fair construction of this petition leads to the inevitable conclusion that it charges the injury to plaintiff to have been occasioned by the negligence of the brakeman, as well as by the negligence of the engineer and other employees. Then going for a minute to the evidence, it is there shown that the middle brakeman was the vice-principal so far as the switching of cars was concerned. Under the evidence his peculiar duty was to get the switch list from the station agent and proceed to do the switching. Whilst so doing the engineer acted under his orders and signals. When he signaled to the engineer to come, he came, and when he signaled to him to go, he went. He was in fact the party, at that time, managing and "operating" that train, or portion of the train. He was in charge of and operating that train in the doing of this work. This under the testimony was his duty.

219 Sup.—38

Now, was this negligence submitted to the jury? We think so. Instruction numbered 1 for the plaintiff, among other things, says: "That defendant's agents, servants and employees in charge of and operating and managing an engine and cars attached thereto, saw the said Errett Hall and his said peril and danger and became aware thereof in time by the exercise of ordinary care, to have avoided injuring him, and that the defendant's said agents, servants and employees in charge of said engine and cars attached thereto failed to exercise such ordinary care and negligently ran said engine and cars against the car upon which said Errett Hall was," etc.

When this is read in connection with the portion of the petition above quoted, it will be seen that the instruction covers the negligent acts of the same persons as is covered in the petition.

It covers the acts of all agents and employees engaged in operating the train at the time, and certainly covers the negligence, if any, of the brakeman who, under the evidence, was in fact the controlling spirit of the operation of the train at the time.

The negligence of this particular employee was not only pleaded but submitted. In the original opinion we discuss fully the effect of the giving of an erroneous instruction for the defendant, when a proper one had been given for the plaintiff, and will not reiterate here. Under the facts, had defendant asked and the court refused an instruction limiting the liability to the negligence of the brakeman, the defendant would have been in condition to complain.

Other points made are sufficiently answered in the original opinion. Motion for hearing overruled. All concur.