HUGH ROSE v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.

Division One, November 15, 1926.

**1. COUPLING CARS: Signal from Brakeman: Moving Train: Knowledge of Peril: Humanitarian Rule.** A brakeman to whom a switching list has been delivered by the station agent is the vice-principal of the company as to the switching of the cars, and while he has no authority to give a couple-up signal to a mere station clerk, his knowledge of the clerk's peril is the knowledge of the company; and where he gave a couple-up signal to such clerk, the plaintiff, and saw plaintiff move in obedience to the signal from his place of safety twelve or fifteen feet and disappear from his view within three feet of the perilous opening between the standing car and the rest of the make-up train, and knew that plaintiff would be exposed to great danger and peril in case the train was moved against the standing car, and he permitted the train, of which he had charge, to move against the standing car, which movement resulted in crushing plaintiff's arm as he was attempting to adjust the coupling pin, his knowledge was sufficient, under

the humanitarian rule, to take to the jury plaintiff's case for damages against the company.

**2. COUPLING CARS: Signal from Brakeman: Safety Appliance: Using Hand.** It is not enough that the coupling of cars was ordinarily effected by safety-appliance devices and without the necessity of railroad employees going between the cars, where the evidence shows that many times the appliance did not operate, and did not operate in the particular case, and the plaintiff pursued the usual course of attempting to adjust the coupling pin with his hand, and the brakeman, who gave him the couple-up signal and knew the danger of an attempted compliance therewith, saw plaintiff proceed, in obedience to the signal, to enter between the cars for the purpose of adjusting the pin, and permitted the train, of which he had charge, to move against the standing car.

**3. ———: Station Clerk: Unauthorized Employment: Custom: Evidence.** Where the petition alleged and the answer specifically denied that members of the train crew and the station agent had instructed plaintiff, a station clerk or helper, to assist, and for a long time plaintiff had assisted, the switching crew in switching the cars and in coupling and uncoupling them, it is not error to admit evidence to establish these issues.

**4. ———: ———: ———: Rebuttal of Immaterial Matter: Humanitarian Rule: Withdrawal of Issue.** Where the petition alleged and the answer specifically denied that for a long time the train crew and the station agent had instructed the plaintiff, a station clerk or helper, and outsiders, to assist in the coupling, uncoupling and spotting of cars, and the engineer of the particular train, introduced by defendant to disprove the allegations, testified that for thirteen years he had operated trains by the station and through the switch yards and had never seen any outsider do any switching of any kind there, it was proper to permit plaintiff to show by witnesses in rebuttal that they, though not in the employ of defendant, had assisted in coupling and uncoupling defendant's cars at such place in the presence and sight of said engineer. Under the pleadings, and the extensive proof to establish and to disprove the allegations, it was not an attempt to contradict the engineer on an immaterial matter; and particularly was it not error to admit such rebuttal testimony where the case was submitted under the humanitarian doctrine, and the instructions withdrew from the jury the question of the authority of the station agent and crew to direct plaintiff to couple or uncouple cars.

**5. TRIAL: Remarks of Judge.** In a trial of an action for damages by a station clerk, who was injured in the coupling of cars, and wherein it was alleged that plaintiff was directed by the station agent to assist in the coupling and defendant's answer denied that the agent had any authority to give such directions, defendant was endeavoring to introduce in evidence a rule of the telegraphers' union, of which plaintiff was a member, which prohibited its members from doing work other than that which they were employed to do, and the court announced that his idea of the law was that defendant was liable because its agent had accepted plaintiff's work, and that therefore the union rule had nothing to do with the case. Thereupon defendant's counsel asked if he might except to the "remarks" of the court; to which the court replied that his attempt to save an exception was "just impudence." Later the court directed the jury to disregard his remarks and the whole incident, and to decide the case only upon the instructions and sworn testimony, and submitted the case under the humanitarian doctrine alone. **Held,** the court's direction, and the instructions withdrawing the pleaded issue and submitting the case under the humanitarian rule, cured any prejudicial effect of the incidental remark, and made inappropriate the rule as evidence.

6. ———: **Argument to Jury: Provoked by Appellant.** Remarks by counsel for plaintiff in a suit against a railroad that "sometimes they think the railroad is above the court; sometimes they seem to think that the railroad lawyers are higher than the judge, and they come in here and make fun of the court" are improper and standing alone demand that counsel be severely rebuked; but where they were apparently provoked by the erroneous statement of counsel for defendant that all of his testimony had been withdrawn from the jury by the court's instructions, and the court sustained an objection to them and ruled that they were improper, and the record does not fully show how defendant's counsel had argued the erroneous declaration that all his testimony had been withdrawn, they do not constitute reversible error.

7. **INSTRUCTION: Plural for Singular: Knowledge: All Servants: Peril Known to Only One.** An instruction authorizing a verdict for plaintiff if the defendant's "agents, servants and employees in charge of and operating the engine and cars saw plaintiff and his peril, and became aware thereof in time, by the exercise of ordinary care, to avoid injuring him, and failed to exercise such care and negligently ran said car against the car upon which plaintiff was preparing the coupler," etc., properly submitted defendant's negligence, although there is no evidence that more than one of defendant's servants saw plaintiff's peril or had knowledge thereof, and that servant was the brakeman who gave plaintiff the couple-up signal.

8. **EXCESSIVE VERDICT: Twelve Thousand Dollars: Loss of Arm.** A judgment for twelve thousand dollars for the loss of his right arm between the elbow and shoulder by a young man, twenty-one years of age, who previously had been earning one hundred dollars per month, is affirmed only on condition that he remit two thousand dollars of the amount as of the date of the judgment.

9. **EVIDENCE IN SUPPORT OF IMMATERIAL ALLEGATIONS: Station Clerk: Unauthorized Instruction to Couple Cars.** Where the petition alleged that the members of the crew and the station agent instructed plaintiff, a mere station clerk or helper, to assist, and for a long period of time plaintiff had been in the habit of assisting, the switching crew in the switching, coupling and uncoupling of cars, and defendant filed no motion to strike out the allegations, but on the contrary both generally and specifically put them in issue by its answer, plaintiff had a right to offer evidence to support the issues thus made; and when objections to the evidence that it was incompetent and immaterial were overruled, defendant had the right to combat it, both by cross-examination and by introducing evidence of its own, without waiving its objections; and where the court, when all the evidence was in, reached the conclusion that the evidence was incompetent, because there was no showing of authority to bind defendant, and by instructions expressly withdrew the allegations and the evidence in support thereof, and submitted the case to the jury under the humanitarian doctrine alone, on the theory that defendant's brakeman signaled plaintiff to couple-up the cars, saw his peril and failed to exercise care to save him, the defendant cannot now be heard to assert that the allegations were immaterial and the court therefore committed reversible error in admitting the evidence. [On Motion for Rehearing.]

---

Corpus Juris-Cyc. References: **Appeal and Error,** 3 C. J., Section 751, p. 843, n. 67; 4 C. J., Section 2708, p. 764, n. 80; Section 2937, p. 955, n. 35; p. 956, n. 43, 55. **Damages,** 17 C. J., Section 425, p. 1101, n. 28; Section 555, p. 438, n 12. **Master and Servant,** 39 C. J., Section 741, p. 631, n. 70; Section 1186, p. 964, n. 92; Section 1345, p. 1161, n. 37; Section 1434, p. 1252, n. 24. **New Trial,** 29 Cyc., p. 1023, n. 32. **Trial,** 38 Cyc., p. 1343, n. 18; p. 1501, n. 45; p. 1502, n. 46, 47, 48, 49; p. 1631, n. 96; p. 1759, n. 27 New.

Appeal from Dunklin Circuit Court.—*Hon. W. S. C. Walker,* Judge.

AFFIRMED (*upon condition*).

*E. T. Miller* and *Ward, Reeves & Oliver* for appellant.

(1) The court erred in refusing the defendant's peremptory in-struction at the close of the plaintiff's case and again at the close of the whole case. The cause was submitted to the jury solely upon the humanitarian doctrine, and also upon the theory that plaintiff was not in the regular line of his employment at the time of his injury, and that he occupied the same position as that of a stranger, trespasser or licensee. To make a case it was incumbent upon plain-tiff to show that the defendant's employees operating the train and cars actually knew that plaintiff was in a dangerous place, and not-withstanding this fact wilfully or wantonly injured the plaintiff. The evidence most favorable to the plaintiff shows that from the po-sition of Brakeman Crass the latter could not see plaintiff when he started to couple the cars after he reached a point as close as three feet to the car; and that ordinarily the coupling was effected without going between the cars by means of a safety appliance device which could ordinarily be operated without going between the cars. Plain-tiff's testimony also shows that after he tried to work the coupling device from a position by the side of the car he then crossed over between the cars and got on the opposite side and then went between the cars to adjust the knuckles on the car. Plaintiff did not transmit any signal or give any notice of any kind to the brakeman that he was crossing between the cars, or that he expected to take up a position between the cars. There was therefore no evidence in the case to go to the jury upon the humanitarian theory. Oatman v. Railroad, 304 Mo. 38; Hall v. Railroad, 219 Mo. 553; Hammontree v. Payne, 246 S. W. 915; See Safety Appliance Acts, Sec. 9967, R. S. 1919; Sec. 8606, U. S. Compiled Statutes 1918. (a) The plaintiff in this case, over the objections and exceptions of defendant, offered a mass of testimony to show that the plaintiff for a long period of time had been in the habit or custom of assisting the switching crew in switching the trains and cars and coupling and uncoupling same. In rebuttal, the plaintiff was permitted to show by witnesses that they had seen the plaintiff and other outsiders assisting in switching operations of the train in the presence of the engineer of the train. The foregoing testimony was incompetent and did not show proper authority or any authority to bind the defendant in this case, and this testimony, especially in view of the remarks and comments of the court in passing thereon, was prejudicial error. Hall v. Railroad, 219 Mo. 553; Oatman v. Railroad, 304 Mo. 38. (b) The foregoing in-competent evidence was nowhere referred to in the instructions of the court to the jury or withdrawn from the jury, and while the instruc-tions permitted a recovery on the humanitarian doctrine, yet we think that the admission of this great mass of testimony, together with the

comments and rulings of the court thereon, and especially in view of the argument of counsel for plaintiff to the jury, constitutes reversible error, and that the error of the court in admitting same was not cured by ignoring it and submitting the case to the jury in instructions on a different theory. Wojtylak v. Coal Co., 188 Mo. 285; Meyer v. Lewis, 43 Mo. App. 417; Pryor v. Railroad, 83 Mo. App. 367; Naughton v. Company, 123 Mo. App. 202; Glenn v. Street Ry., 167 Mo. App. 114; Vest v. Kresge Co., 213 S. W. 168; Williams v. Modern Woodmen, 243 S. W. 274. (2) The court committed reversible error in many prejudicial remarks made during the progress of the trial in the presence of the jury. State v. Drew, 213 S. W. 106; Schundt v. Railroad, 149 Mo. 283; State v. Davis, 217 S. W. 91; McElwain v. Dunham, 221 S. W. 774; Landers v. Railroad, 134 Mo. App. 88; Clear v. Van Blarcum, 241 S. W. 81; Rooker v. Railroad, 226 S. W. 70; State v. Davis, 284 Mo. 706; State v. Jones, 197 S. W. 158. (3) The court erred, in permitting counsel, in closing the argument to the jury, to make improper argument to the jury. Monroe v. Railroad, 249 S. W. 644; Beck v. Railroad, 129 Mo. App. 24; 38 Cyc., 1498, 1499. (4) The court erred in giving on behalf of plaintiff Instruction 1. There was no evidence in the case authorizing the submission of the case upon the theory that any of the other employees saw the plaintiff in a place of peril. But this instruction authorized the jury to go outside the evidence and to return a verdict if any of the employees saw the plaintiff. (5) The verdict and judgment for $12,000 are excessive. Jones v. Railroad, 287 Mo. 64; Applegate v. Railroad, 252 Mo. 173; Crockett v. Railways Co., 243 S. W. 902.

*T. R. Ely* and *Tom Ely, Jr.,* for respondent.

(1) The court submitted this case solely upon the humanitarian doctrine. The evidence is that respondent was familiar with signals for moving, switching, coupling and uncoupling cars, and that he received a signal from appellants' witness Crass to uncouple the cars; that he had switched with him numbers of times before and every day during the cotton season that fall; that Crass saw respondent going towards the place he was to couple the cars and saw him when he was within three feet of the coupling and still going in the direction of coupling when witness last saw him. It was therefore a question for the jury to decide as to whether the brakeman had knowledge of respondent's place of peril. It was not necessary that the conductor or any member of the train crew had knowledge of respondent's peril. Hall v. Railroad, 219 Mo. 553. (2) There was no error in the introduction of testimony as to the habit or custom of respondent assisting the switching crew in

315 Mo.—75.

switching the trains and cars and coupling and uncoupling the same. The evidence followed the petition, but it was not necessary to submit the case upon all the allegations of the petition, and as it was submitted solely upon the humanitarian doctrine there was no error in admitting this testimony. It was competent for the purpose of showing that respondent was familiar with the signals of the trainmen and it was necessary to prove that he was, for if he had not been familiar with the signals he could not have obeyed them. Hall v. Railroad, 219 Mo. 553; Oatman v. Railroad, 304 Mo. 38; Hubbard v. Wabash Ry. Co., 193 S. W. 579. (3) The court did not commit reversible error in his remarks made during the progress of the trial. The language shows that at that stage of the trial it was the court's idea that the appellant was liable in damages because the agents of the company had accepted his work, and that statement was not made upon any question that was afterwards submitted to the jury, and it was clearly not such an expression of opinion by the trial court as would prejudice the jury against the appellant. Where there is a clear case of liability the court will not reverse a case because of remarks by the court, unless they are flagrantly prejudicial to the cause of the appellant, and if the court committed error in this respect he immediately thereafter corrected the error. Hutchison v. Richmond Safety Gate Co., 247 Mo. 71; Copeland v. Ins. Co., 191 Mo. App. 435; Stevens v. Fire Ins. Co., 139 Mo. App. 369; Atkins Bros. v. Landa, 130 Mo. App. 542. (4) There was nothing said in the argument of counsel in closing the case that was improper and not justifiable in view of the argument of counsel for appellant, this trouble was started by counsel for appellant. Brady v. Springfield Traction Co., 140 Mo. App. 421. Where a verdict for plaintiff would have resulted in any event, improper argument of plaintiff's counsel is not reversible error. Kinney v. Met. St. Ry. Co., 261 Mo. 97. The verdict was unanimous and in such circumstance the court will be slow to say the jury was influenced by any improper argument by plaintiff's attorneys. Toreyson v. United Ry. Co., 144 Mo. App. 626; Henly-Waite Co. v. Grannis, 171 Mo. App. 392; Kinney v. St. Ry., 261 Mo. 97; Tuck v. Springfield Traction Co., 140 Mo. App. 335. (5) The verdict is not excessive in view of the expectancy that respondent has.

ATWOOD, J.—This is an appeal from a judgment for $12,000 for personal injuries which necessitated the amputation of plaintiff's right arm between the elbow and shoulder.

Plaintiff went to trial on his amended petition which, in addition to the usual formal averments, alleged his employment by defendant on October 4, 1921, at the joint station maintained and operated by the St. Louis Southwestern Railway Company, the Paragould &

Southeastern Railway Company and this defendant at Arbyrd, Missouri; that as such employee it was his duty to make out switching lists and deliver same to the conductor or other agents in charge of defendant's trains; that on said date on the arrival of defendant's north-bound local freight train No. 856 at Arbyrd, plaintiff delivered a switching list to defendant and defendant's agents, servants and employees, which required the spotting or setting of a box car at a cotton-gin platform on a wye or connecting track; that plaintiff had been permitted, requested, ordered and was accustomed for more than two years previous to assist defendant's agents, servants and employees in handling freight and switching lists, and on numerous occasions at their request had assisted in switching and coupling cars and doing such things as a brakeman usually does; that plaintiff was in the usual and proper course of his employment at the time he delivered said switching list; that on account of a certain car then standing at or near said cotton-gin platform it became necessary to couple into and remove the same in order to properly set the box car called for on said switching list; that the engine had a train of six or seven cars attached to it and was under the control and management of defendant's engineer, fireman and conductor and two brakemen who started and commenced the spotting or setting of the car in question; that one of defendant's said brakemen requested plaintiff to assist in the switching of the box car in question, and in the coupling of the rear car attached to said train of cars to said car standing at or near said cotton-gin platform; that in obedience to the order, request and direction and signal of said brakeman plaintiff commenced to assist in said switching, going to the particular stationary car as directed by said brakeman and undertaking to prepare the coupler thereto attached, said train standing still at the time and leaving a distance of twelve to eighteen inches between the unattached car and the car next to it; that while plaintiff was so engaged in preparing said coupler under the order and direction of said brakeman he was in a place of peril; that defendant and its said brakeman, agents, servants and employees operating said train, knowing that plaintiff was preparing said coupler on said unattached and standing car and in a place of great peril, and after they could have known it by the exercise of ordinary care, negligently and carelessly and without any warning whatever to plaintiff, and with great and unusual force, backed said engine and train of cars and ran same against said unattached car on which said plaintiff was working, under the order, signal and direction of defendant, by reason of which plaintiff's body and arm were caught between said engine and train of cars moving backward and said unattached car. and his right arm was badly bruised, mangled and broken, so that it became necessary to have the same amputated between his elbow and

shoulder, and his body was greatly bruised; that defendant was performing the work of assisting the second brakeman, under the orders, directions and signals of defendant's agent, servant and employee and defendant's brakeman; that he was doing the work as he was ordered to do and as he had been accustomed to do in the usual and ordinary way; that he was at the place he was ordered to be by defendant's servants, agents and employees and was preparing the coupler in the ordinary and careful manner and was at a place usual for one to be in preparing a coupler in order that two cars might be attached.

Defendant's answer, after admitting the formal allegations of plaintiff's petition, denied that it was any part of plaintiff's duty to work around or about the switching of the cars at Arbyrd as alleged in plaintiff's petition; denied that it was any part of plaintiff's duty to assist the brakeman in making connections or to see that the couplings were made or to cut loose or spot cars; denied that the brakeman had any authority to direct plaintiff to do any such work; and alleged the facts to be that if plaintiff undertook to do the matters and things alleged in his petition in coupling the cars, or if plaintiff undertook to receive directions from a brakeman, that such was outside of his employment and a wholly voluntary act and done without any authority from defendant or any person authorized by it, and if plaintiff had been doing said work or assisting in coupling cars and spotting cars as alleged in his petition it was without the knowledge or consent of defendant, and that defendant's brakeman had no authority to direct or instruct plaintiff to do said work so alleged in the petition. and that if plaintiff undertook to do the same it was outside of his employment and a wholly voluntary act on his part, for which defendant is not liable. Defendant further pleaded plaintiff's contributory negligence.

Plaintiff's reply was in the nature of a general denial.

I. Appellant's first and second assignments of error are' that the trial court erred in refusing defendant's peremptory instruction offered at the close of plaintiff's case and again at the close of the whole case. The case was submitted solely under the humanitarian rule. In support of these assignments of error appellant says

**Brakeman: Knowledge of Peril.** that "the evidence most favorable to the plaintiff shows that from the position of Brakeman Crass the latter could not see plaintiff when he started to couple the cars after he reached a point as close as three feet to the car; and that ordinarily the coupling was effected without going between the cars by means of a safety appliance device which could ordinarily be operated without going between the cars."

Defendant's main track at Arbyrd ran north and south, and the main track of the St. Louis Southwestern Railway Company ran east and west, these two main tracks being connected by a wye or connecting track extending in a southwesterly direction from a point on defendant's main track north of the station jointly maintained at the intersection of said two main tracks to a point on the main track of the St. Louis Southwestern Railway Company west of said station. According to plaintiff's testimony defendant's north-bound local freight train reached Arbyrd about 3:24 in the afternoon of October 4, 1921. It carried a full crew, consisting of a conductor, engineer, fireman and two brakemen. When the train stopped plaintiff handed defendant's conductor a switch list, which the conductor handed to Bill Crass, the hind brakeman. The switch list directed that a car be spotted at the seed house of the Arbyrd Gin Company, another at the cotton platform, and the last car on the transfer or connecting track was to be picked up. Two cotton gins and two cotton platforms, besides other buildings, were located along the wye or transfer track, and after delivering the switch list plaintiff went over to the transfer track to see that the cars were spotted as directed. When plaintiff got to the cotton platform Mr. Hancock, who was manager of the Arbyrd Gin Company, asked him to be sure and have the car spotted because it had been knocked off the spot for three days. In order to hear Mr. Hancock plaintiff had climbed on top of a box car in the switch train then moving slowly south over the transfer track. After communicating this request to Crass plaintiff climbed off of the box car and walked east twelve or fifteen feet away from the transfer track, where he was standing looking at the train when defendant's brakeman Bill Crass attracted his attention by a call or whistle. Plaintiff testified on this point as follows: "He hollered at me and gave me a couple-up signal and I turned—he was looking right direct at me, and I turned and walked back to the next car and started to make a coupling, and pulled up on the pin and it wouldn't lift and I jerked on it three or four times and it wouldn't lift up, and the cars was standing twelve or fourteen or maybe eighteen inches apart; anyhow they were not far enough to undertake to walk between them, and I put one hand on each coupling and sprang over between them and reached in and got the pin with my left hand and reached for the knuckle with my right and the cars came together on me. . . . Crass was on top of a box car when he gave me this couple-up signal. I was something like a car and a half or two car-lengths from him; and he was in plain view of me; facing right towards me. I couldn't see anyone connected with the railroad beyond me from where I was located. There was supposed to be, I don't know whether there was nor not, I couldn't say. The other brakeman was supposed to

be between him and the engine.    The engine was northeast from me; the car he gave me the signal to couple up was about a car-length southwest of where I was standing.    There was no other employee of the railroad down in that direction.    There was no other person down that way at all, no one out there, not even any patrons of the railroad standing around out there at all.    It is plumb off of the platform, kind of in a small grove.    I am familiar with railroad signals. . . .    There wasn't anything in the way to keep him from seeing me as I went to make that coupling. . . .    Crass could see me until I went in between the box cars to make this coupling; the last time I saw him he was looking right at me. . . .    There was no bell rung or no whistles sounded from the time I went in there until after the accident or the injury. . . .    All the cars was standing still then, but the car I was going to couple on to wasn't coupled with the rest of them, the rest of this row of cars were coupled together.    I undertook to catch hold of the lift pin on the standing car.    On the end of the box car they have knuckles made like I said before, and they have a pin that falls down through there, a pin comes up through the top, and there is a pin coming up and the rod crooks over and comes out to the edge of the car; you catch hold of this rod, standing outside of the car here, to do the lifting; the rod that extends from the knuckle out to the outer. edge of the car is the pin lifter; that's the thing I caught hold of with my left hand.    I undertook to lift it here; about the middle of that car are these knuckles that the pin lifter would lift the pin in.    I walked up to it, like here is the car, and jerked a time or two and took hold with both hands and jerked it, and it wouldn't come loose; I jerked up this way.    Back here are the cars that will come forward. When I couldn't open the knuckle that way I put my hand on each of these knuckles, one on the car that was stationary and one on the train of cars, the last car next to me, and jumped over this way and turned around.    I don't know where Bill Crass was at that time; I couldn't see him, and he couldn't see me after I went between the cars.    I didn't tell him where I was going, but he had told me where to go; that is, he gave me whatever signal I said; that was good enough for me.    After I got through on this side, that would put my left hand to the pin lifter on the car that was to come back.    I took hold of that pin lifter with my left hand and it lifted; the knuckles-don't open without you pull them.    I was facing the car that way, standing astride of the rail, and then is when I reached over with my right hand and caught hold of the knuckle.    Reached over with my right hand like that, and this bunch of cars just jumped right towards me; but it was the car that moved, that was the car I was trying to open the knuckle on; this other car back here was still.    While I had my left hand hold of the pin lifter and

my right hand on the knuckle, the car I was operating on moved back this way and mashed my right arm. . . . The reason I went in there was that this fellow Crass directed me to go in there by giving me a signal and hollering or whistling at me; that's what I say now. I say he knew I went in there because he was looking right towards me when I started in there; I never looked back at him any more after I started that way; I had no occasion to. I had to walk about ten feet before I would get to this opening, something like that; I don't remember the exact distance I had to walk, but it was quite a distance.''

Plaintiff was recalled by defendant for further cross-examination, and the following question was propounded and the following answer given:

''Q. Now Mr. Rose, at the time you say that this signal was given you, and you went to the opening between the two cars, I believe you said the brakeman was up on top of the second car ahead of you, the one next to you and then the one just next to it? A. I said he was about a car-length from me; I don't remember whether there was any coupling between me and him or not. I would be probably three feet to the car when he could see me. In other words, he could see me until I got as close as three feet to the car, provided I had walked straight to the car. If he was on the front end of the car and you was to walk to the coupling of the other car and he was standing in the middle of the car, it would be impossible for him to see you then even. After I got within three feet of this car, it would have been impossible for him to have seen me any more.''

In Hall v. Railroad, 219 Mo. 553, l. c. 593, we held that a brakeman to whom the switch list from the station agent had been delivered was the vice-principal as far as the switching of cars was concerned. Reading the testimony in the light most favorable to plaintiff, as we must do on demurrer to the evidence, it must be conceded that defendant's vice-principal saw plaintiff when he gave the signal to couple up, because to look was to see; that he gave this signal to plaintiff, because there was no one else present to whom it could have been given; and that he saw plaintiff start toward the cars when the signal was given and knew plaintiff was about to enter a place of peril. It is immaterial whether or not Crass continued to watch plaintiff move from his place of safety twelve or fifteen feet away from the transfer track until he disappeared from view when within three feet of the car he was undertaking to couple up. He knew exactly what the consequence of his ''couple-up'' signal would be and ''he was looking right at'' plaintiff when he turned toward the cars to obey the signal. While the giving of this signal to plaintiff was unauthorized and not binding upon defendant, yet the circumstances in evidence clearly indicate that this brakeman had ac-

tual knowledge of plaintiff's movement from a place of safety into a place of danger where he would be exposed to great peril and danger in case there should be any movement of the cars while he was there, and the brakeman's knowledge was the knowledge of defendant. Every movement of the engine and cars was controlled by Crass who had charge of the switching, and the evidence is conclusive that there was a movement of the cars after he saw plaintiff, when this signal or order was given, move from his place of safety toward one of great peril and danger, which movement of the cars resulted in plaintiff's injury. Having given plaintiff the signal and seen him turn toward the cars in response thereto it was plainly this brakeman's duty to permit no movement of the cars until he had actual knowledge that plaintiff had either performed or abandoned his perilous undertaking and was again in a place of safety. On this point defendant's own witness Howard Cline, who was the head brakeman on defendant's train at the time plaintiff was injured, said: "The rule would be if a man is sent in to make a coupling, that the train would stand still until the man came out of there and gave a signal that he was ready to make the coupling; that is considered a hazardous job, and requires great care and caution." Nor is it enough to say that in this case the cars were equipped under the safety appliance statutes, and that ordinarily it is not necessary

**Safety Appliance.** to go between the cars to "couple up." The testimony shows that many times this safety appliance cannot be operated, as in this case, and under the "couple-up" signal the brakeman, as Crass testified, "just reaches in with his hand and opens it like that; you have hold of the knuckle; like that is the knuckle, you have got the pin pulled and you take hold of it and open it like that. If the two cars come together while he had hold of the knuckle it would mash it." The danger incident to compliance . with a "couple-up" signal was thus well known to Crass and immediately after he gave plaintiff this signal, although he had no authority to give it, he, and through him this defendant, had actual knowledge of plaintiff's peril and danger in time to have prevented the injury by the exercise of ordinary care. There was sufficient evidence to take the case to the jury under the humanitarian rule. Defendant's demurrer was properly overruled.

II. Appellant next urges as reversible error the admission of testimony, over defendant's objection and exception, that members of the train crew and the station agent had instructed plaintiff to assist, and for a long period of time plaintiff had been

**Evidence of Unauthorized Acts.** in the habit of assisting, the switching crew in switching the trains and cars and coupling and uncoupling same, and that this practice had been indulged in with other outsiders. This habit and custom as to plaintiff

was expressly pleaded in plaintiff's amended petition, and the allegation was denied in defendant's answer, which also averred that it was no part of plaintiff's duty to assist the brakeman, that the brakeman had no authority to direct plaintiff to do these things, and that if plaintiff did them defendant had no knowledge thereof. Upon the issue thus made plaintiff had a right to introduce evidence. Furthermore, defendant on cross-examination recognized and combated this issue, and in presenting its own case witness after witness was examined in an effort to disprove this line of plaintiff's testimony. Several of defendant's witnesses testified that they had no knowledge of the habit or custom complained of, and by way of rebuttal evidence plaintiff's attorneys showed by two witnesses that they, though not in the employ of defendant, had assisted in switching and uncoupling defendant's cars in the sight and presence of defendant's engineer, Ed Morris, who was the engineer moving defendant's train at the time plaintiff was injured, and who testified as a witness for defendant in this case. On defendant's objection counsel for plaintiff stated that on cross-examination witness Morris had testified that "for the thirteen years he had operated a Frisco train by and through Arbyrd, he never saw any outsider do any switching of any kind at Arbyrd," and that this evidence was offered in rebuttal to contradict him. Defendant's counsel objected that this evidence was not in rebuttal, that no foundation was laid for it, and that it undertook to contradict witness Morris upon an immaterial matter. Under the pleadings and character of proof made by both plaintiff and defendant we do not think it was an immaterial matter, and appellant has not favored us with a full and complete transcript of the testimony of witness Morris in support of the objection that the evidence was not proper rebuttal. However, the case was submitted solely under the humanitarian rule, and the issue upon which this line of testimony was predicated thereupon fell out of the case. We have carefully examined our opinions in Hall v. Railroad, 219 Mo. 553, and Oatman v. Railroad, 304 Mo. 38, and find them without application to this phase of the case.

Appellant insists that the foregoing evidence was nowhere referred to in the instructions of the court to the jury or withdrawn from the jury, and that the court's error in admitting same was not cured by ignoring it and submitting the case to the jury on a different theory. We have just ruled that the court did not err in admitting this character of evidence, and we do not agree with appellant's suggestion that this evidence and the theory of the case upon which it was introduced were ignored by the court. Instructions 6, 11 and 13 given at the request of defendant plainly advised the jury that it could not find for plaintiff on the theory to which defendant here objects. These instructions read as follows:

"6. The court instructs the jury that the plaintiff pleads in his petition negligence on the part of defendant, in that defendant's brakeman signalled plaintiff to make a coupling between two cars at Arbyrd on October 4, 1921, and negligently moving its train upon and against plaintiff while making said coupling, and upon this theory of the case the court instructs you that you cannot find for the plaintiff.

"11. The court instructs the jury that if you find and believe from the evidence the plaintiff was employed by defendant as a station clerk at the defendant's station at Arbyrd, then you are instructed that the station agent of the defendant at the said town of Arbyrd had no power or authority to authorize or direct the plaintiff to couple or uncouple cars in defendant's trains, and that the plaintiff in so undertaking to couple or uncouple said cars was outside of and beyond the scope of his employment with defendant.

"13. The court instructs the jury that if you find and believe from the evidence in the case the plaintiff was employed by defendant as a station clerk or helper at the station of Arbyrd, and that it was no part of his ordinary duties under his employment to couple or uncouple cars in the defendant's trains, then you are instructed that the defendant's employees operating said trains had no right, power or authority to direct or authorize the plaintiff to engage in the work of coupling or uncoupling cars."

Appellant cites seven cases in support of this latter objection, but none of them deal with testimony offered in support of issues clearly within the pleadings and thereafter abandoned and instructed against by the court. We rule this point against appellant.

III.  Appellant next urges that certain remarks made by the court during the progress of the trial and in the presence of the jury constitute reversible error.

**Remarks of Court.**  1.  Defendant's counsel endeavored to prove that the railroad telegraphers' union, of which plaintiff was a member, had a rule which prohibited its members from doing any work except that which they were employed to do, and while arguing the admissibility of this evidence in the face of the trial court's adverse ruling, the following colloquy occurred between the court and defendant's counsel:

"THE COURT: Wait a minute; I want to make my position clear. It is apparent that this man was not a switchman; my idea is that they are liable because their agent had accepted his work; I don't suppose the plaintiff claims he was hired to do this particular work, but they had suffered him to do it, and whether he had some union rules that said he shouldn't do it, of course, could neither give the defend-

ant any more rights or deprive the plaintiff of any rights that might arise from this transaction.

"MR. WARD: May I except to the remarks of the court?

"THE COURT: There are no remarks to except to; I'm giving my ruling; the ruling affects you, but the remarks of the court do not. I haven't said anything to prejudice you.

"MR. REEVES: We could save the exception, and if it is worth anything it would be all right.

"THE COURT: No, sir, you haven't got anything to except to; it's just impudence.

"MR. REEVES: Just what?

"THE COURT: Impudence.

"MR. REEVES: I don't mean to be impudent at all. We except."

2. Thereafter at the close of plaintiff's case the court thus directed the jury to disregard the foregoing colloquy:

"THE COURT: Now gentlemen of the jury, the court at this time desires to refer to the fact that in the ruling a short time ago about the admission of testimony, the court gave a reason for the ruling embodying the law, and exception was made by one of the attorneys to the ruling, and an exception was made by another attorney to the remarks of the court, and the court didn't think that was a subject of exception, and there was some colloquy between counsel and the court, and the court now desires to say to you you must disregard that and not let it enter into your consideration in arriving at your verdict, because you must decide this case only on the sworn testimony and the instructions, and not upon anything else. That's all I want to say."

3. Defendant's counsel subsequently renewed their efforts, contrary to the court's previous ruling, to prove the union rule, and they now object to the following ruling of the court thereon:

"THE COURT: That is excluded under a previous ruling of the court for the same reasons that were given heretofore, at which time the colloquy arose to which reference has been made."

4. Finally, defendant's counsel claim prejudicial error on account of the following exception and the court's ruling thereon:

"MR. WARD: Your Honor, I think he has asked that three or four times, and I object to it as repetition.

"THE COURT: Well, I might say that I remember about his answer, but somebody might object to the remarks of the court, so I'll overrule your objection."

From the first paragraph of the first colloquy and its context we gather that the trial court's reference to his "idea" or theory of the case was a mere incident in the course of his ruling on the particular objection made. Appellant's counsel were strenuously seeking to prove the existence of a union rule over plaintiff's objection, and the court's ruling thereon was the principal thing just then before the

jury. However, if the court's incidental remark did catch the attention of the jury, it was rendered non-prejudicial to defendant by the court's subsequent charge to the jury at the close of plaintiff's case, and by the court's instructions at the close of the whole case denying plaintiff's right to recover on any such theory and limiting his right of recovery to the humanitarian rule. This reference was not a comment by the court upon the evidence, as in a number of the cases cited on this point in appellant's brief, but a mere incidental allusion to the court's then "idea" of defendant's liability under the issue at that stage of the trial, which thereafter dropped out of the case and was withdrawn from the jury by virtue of the court's charge and instructions.

As for the court's charge of impudence on the part of defendant's counsel in the latter part of this colloquy, we find no justification for it in the cold record before us. Although counsel were persistent in their efforts to get this evidence as to the union rule before the jury, their presentation and objections were apparently at all times respectful. Seemingly this remark of the court was brought on by some occurrence that was not or could not be preserved in the condensed abstract of the record, or it was a hasty, momentary expression of impatience growing out of the cumulative annoyances that usually attend a long trial. In any event it was brief, spontaneous, clearly free from malice or ill-will, and we hold that it was non-prejudicial in the light of the court's above charge to the jury at the close of plaintiff's case. We are here reminded of the ripe judicial experience and broad sympathy of our late brother WOODSON so appropriately invoked and finely expressed in Hutchinson v. Safety Gate Co., 247 Mo. l. c. 118, where he said: "Our own experience teaches us that judges are but human, and they, like other people, during the excitement of the trial, worry over the perplexing questions that are presented and on the spur of the moment may in an unguarded moment say things which they did not mean, especially as it appears in black and white, disconnected from its surroundings, and feel sorry for having said them before the echo of the voice is lulled into silence."

Appellant complains of the court's above charge at the close of plaintiff's case admonishing the jury to disregard the colloquy and not let it enter into their consideration in arriving at a verdict, but we think it was properly given and effectually cured any error that might otherwise have prejudiced defendant. If this unfortunate occurrence was thereafter directly or indirectly alluded to by the court it was because of counsel's persistent presentation of the same character of evidence which had been previously excluded, and as we view the case defendant was not hurt thereby. Nor is there any merit in defendant's claim of prejudice because of any other remarks of the court that have been called to our attention.

IV. Appellant urges that the following which occurred during the argument of counsel before the jury constitutes reversible error:

<div style="margin-left:0">**Argument to Jury.**</div>

"Senator Ely: Sometimes it seems like they think the railroad is above the court; sometimes they seem to think that the railroad lawyers are higher than the judge, and they come in here and make fun of the court—

"Mr. Ward: We object to that line of argument now—

"Senator Ely: By golly, I'm going to stand pat on that.

"Mr. Ward: Nobody said or intimated that, and that kind of argument shouldn't be used in a lawsuit.

"The Court: I understand he is referring to your declaration that all your testimony had been withdrawn from the jury.

"Mr. Ward: Yes, sir; and I understand that these instructions show that."

The above remarks by plaintiff's counsel were improper, and while objection thereto was finally sustained and the jury charged thereon, yet it appears that counsel should have been severely rebuked. However, the court addressing counsel for defendant said: "I understand he is referring to your declaration that all your testimony had been withdrawn from the jury." Counsel for defendant replied: "Yes, sir; and I understand that these instructions show that." Now, as a matter of fact, the instructions show nothing of the kind. The great mass of evidence which defendant had introduced to show that its agents, servants and employees were without authority to direct plaintiff to assist in the switching, and that defendant had no knowledge of his ever having done so, was necessarily taken from the jury when this issue fell out of the case, and properly so on defendant's own requested instructions, but all of defendant's testimony opposing plaintiff's humanitarian theory of the case was submitted to the jury. The record does not disclose just how defendant's counsel had argued the erroneous view above indicated, but in reply plaintiff's counsel was entitled to make proper comment on the position taken. The court rightly held that these comments were improper and sustained defendant's objection thereto, but the trial court who observed counsel and heard all the arguments was better qualified than any one else to gauge their impropriety. The doctrine here applicable is thus stated in 38 Cyc. 1501-2, under the sub-heading, Retaliatory Statements and Remarks: "Improper language used in argument is not ground for reversal, where such language was provoked by the remarks of counsel for the adverse party, unless it appears quite plainly that the verdict was influenced thereby; and especially is this true where exceptions to the argument are sustained, and the jury specifically instructed to disregard it. Moreover, the rule applies, although the language used would clearly authorize a reversal in the absence of

such provocation.'' We find no reversible error in the above remarks.

V. Appellant insists the court erred in giving Instruction 1 on behalf of plaintiff, which authorized a recovery if the defendant's agents, servants and employees in charge of and operating and managing the engine and cars saw plaintiff and his peril and danger, and became aware thereof in time, by the exercise of ordinary care, to have avoided injuring him, and failed to exercise ordinary care and negligently ran said cars against the car upon which the plaintiff was preparing the coupler, without any warning or signal, with great and unusual force, and plaintiff was thereby injured. Appellant says that there is no evidence that more than one of defendant's agents, servants and employees had such knowledge. While it is true that the evidence connected only defendant's brakeman Bill Crass with actual knowledge of plaintiff's presence in a place of peril, yet substantially the same form of instruction was approved in Hall v. Railroad, 219 Mo. 553. In that case the question was whether the engineer and brakeman had actual knowledge of plaintiff's peril. We held that the engineer did not have, but that the brakeman had such knowledge, and that the brakeman's negligence was properly submitted under such an instruction. This exception is also ruled against appellant.

VI. Appellant claims that the verdict was excessive. It appears to us that this objection is well taken. At the time plaintiff lost his right arm as a result of this injury he was twenty-one years of age, and had previously been earning about $100 a month. A judgment of $10,000 would have been more in line with the injury sustained. If within ten days from this date respondent will enter a *remittitur* of $2,000 as of the judgment date, the judgment will stand affirmed in the sum of $10,000; otherwise, the judgment will be reversed and the case remanded for a new trial.

All concur, except *Graves, J.,* absent.

ON MOTION FOR REHEARING.

ATWOOD, J.—In their motion for a rehearing counsel for appellant find no fault with our view that the case finally made was on the humanitarian rule, but urge that allegations in plaintiff's petition to the effect that members of the train crew and the station agent had instructed plaintiff to assist, and for a long period of time plaintiff had been in the habit of assisting, the switching crew in the switching of trains and cars, and in the coupling and uncoupling of cars, were not *material* allegations, and that the court committed reversible error in admitting evidence in support thereof.

Defendant filed no motion to strike out or to make the petition more definite and certain, but in the first instance answered both generally

and specially putting these allegations as well as other matters alleged in issue. In this state of the pleadings plaintiff had a right to offer evidence tending to support the issues. From time to time defendant objected to evidence offered in support of the above allegations. When these objections were overruled defendant, of course, had a right to combat the trend of this evidence without waiving its objections thereto, and we have not held otherwise. Defendant's objections were advanced on the grounds that such evidence was incompetent, immaterial and did not tend to prove any of the allegations of the petition. Even now counsel contend that this evidence was incompetent, because there was no showing of authority to bind the defendant. When all the evidence was in the trial court evidently shared this view, because the case was submitted as made solely on the humanitarian theory, and above Instructions 6, 11 and 13, expressly directing the jury that they could not find for plaintiff on the theories advanced by the above and similar allegations, were given in the exact form asked by defendant. Furthermore, defendant never made any further or different request that this character of evidence be withdrawn from the jury. We think it was sufficiently withdrawn by the instructions given, but appellant having failed to request that it be done otherwise is not in position to complain of the court's action. Car Mfg. Co. v. Rolling Mill Co., 285 Mo. 669, and similar cases cited by appellant do not cover this situation. Motion for rehearing, and to transfer to Court en Banc, overruled.